NEBRASKA ASSOCIATION OF PUBLIC EMPLOYEES, A CORPORATION, APPELLEE, V. STATE OF NEBRASKA, DEPARTMENT OF EDUCATION, APPELLANT, NEBRASKA SCHOOL FOR THE DEAF EDUCATION ASSOCIATION ET AL., INTERVENORS-APPELLEES.

281 N. W. 2d 544

Filed July 24, 1979. No. 42286.

Paul L. Douglas, Attorney General, and J. Kirk Brown, for appellant.

Steven D. Burns of Noren and Burns, for appellee.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

BRODKEY, J.

This case originated as an action brought by the Nebraska Association of Public Employees, a corporation and labor organization, hereinafter referred to as NAPE, in the Court of Industrial Relations seeking to be designated as the exclusive bargaining representative of certain employees of the appellant, State of Nebraska, Department of Education. On April 14, 1978, the Court of Industrial Relations, hereinafter sometimes referred to as the Court, entered an order with reference to election procedures and set the date of the election for May 22, 1978, within the voting units previously determined in an opinion and order of the Court, dated March 14, 1978. The report of election discloses that NAPE was successful in the election and was designated as the exclusive bargaining agent of the employees in the two voting units, the voting being 190 to 56 in the main unit, and 38 to 6 in the teacher's unit.

On June 5, 1978, appellant filed an objection to the election, claiming that on Friday, May 19, 1978, prior to the election which was held on Monday, May 22, 1978, the plaintiff, NAPE, caused to be distributed to employees of the appellant eligible to vote in the election a certain publication or leaflet entitled "NAPE 76 NEWSLETTER" containing an article entitled "HAS COLLECTIVE BARGAINING WORKED WITH OTHER STATE AGENCIES?" in which article NAPE represented it was responsible for obtaining certain employees' benefits through the collective bargaining process for the Nebraska Game and Parks Commission, which representations were untrue and misleading, and may have been relied upon by the voting employees and have influenced them to vote in favor of NAPE in the election. It was further alleged that the actions of NAPE were an effort to mislead the employees and prevented them from making an informed choice in

the election. Three days later, on June 8, 1978, appellant also filed a motion to void the election.

A hearing on the objection and motion was held on June 28, 1978, before the Honorable Richard L. DeBacker, one of the judges of the Court of Industrial Relations, at which time evidence was adduced and the matter was taken under consideration. Thereafter, on July 12, 1978, there was filed in the office of the clerk of the Court of Industrial Relations a document entitled "Findings and Order" in the above matter, reciting that it had been entered on July 11, 1978, and had been heard before Judges DeBacker, Kratz, and McGinley. In the order of the Court, written and signed by Judge DeBacker, the Court reviews the claims of the appellant that the newsletter distributed by NAPE contained untrue and misleading misrepresentations which its employees may have relied upon, and concludes: "As we interpret the evidence, there is at least a grain of truth in the claims made in the newsletter. But the position of the Department is that the representations are twisted in that grievance discovery procedures, for example, are available to all state employees who fall under the state personnel system, albeit they are available as the result of requests made by NAPE to the personnel department and the language in the agreement between NAPE and the Commission is slightly different from the general policy. A similar characterization can be made of each of the other claims by NAPE and the criticisms of them by the Department.

"We are unable to find that the claims of NAPE, even if exaggerated, go beyond usual political or commercial sales puffing. There is no solid evidence that the Department's employees relied upon or were influenced by the representations and not even any inference that the representations had a substantial impact on the outcome of the election, given the overwhelming majority in favor of repre-

sentation by NAPE." The Court then overruled the objection to the election and denied the motion to void the election. Appellant's subsequent request for a rehearing en banc was denied on July 25, 1978, and appellant then perfected its appeal to this court "from the order of this court overruling the respondent's objection to election and denying the respondent's motion to void the election, and from the order of this court denying the respondent's request for rehearing en banc on these matters." For reasons hereinafter set out, we affirm the ruling of the Court of Industrial Relations as to the order and issues appealed from.

The newsletter in question was distributed by an employee of the Nebraska Department of Education, Peggy Weeks, who was vice president of the Department of Education, chapter No. 76, of the Nebraska Association of Public Employees. She testified that she had distributed the newsletter on the morning of May 19, prior to her work hours. She picked up copies of the newsletter from the president's office, took them around to the offices in the Department of Education, and laid them on the desks of most of the employees on the 6th floor. She did not attempt to distribute any of the material outside of the 6th floor and has no idea of the number she distributed. We note at this point that there is absolutely no evidence in the record as to the number of newsletters which were distributed, received, and read; any impact upon the voters; or whether the newsletter in question had the effect of changing the result of the election, although at the hearing there was an offer of proof made that one witness had been riding on a bus with a person, who identified herself as an employee of the Department of Education, who told him she believed the employees of the Game and Parks Commission had received certain benefits from being a member of the union.

The portion of the "NAPE 76 Newsletter" pub-

lished by the Department of Education, chapter No. 76, of the Nebraska Association of Public Employees, which was distributed on May 19, 1978, and which is in controversy in the present case, reads as follows: "HAS COLLECTIVE BARGAINING WORKED WITH OTHER STATE AGENCIES? YOU BET! Let's look at some history of how collective bargaining helped GAME & PARKS in just one year:

"1) It now appears that Game and Parks will have bargained a cash advance system for travel by December 1 of this year. This will mean that an employee is paid travel expenses before travelling — not 30 days later.

"2) Game and Parks established a 'discover' procedure in grievance cases where each party can learn in advance of the hearings what information the opposition has to present. This will permit better hearings and more rapid solutions to grievance cases.

"3) Game and Parks was successful in bargaining for five days of funeral leave instead of four. This has now become a part of all state government personnel policies — THUS WE ARE NOW SHARING THE RESULTS OF COLLECTIVE BARGAINING ACHIEVED BY ANOTHER STATE AGENCY.

"In addition, an employee of Game and Parks may now take up to two weeks of vacation leave whether earned or not but charged to future leave for the purpose of clearing estate matters following a funeral.

"4) Other items bargained by Game and Parks include broader paid training programs for both support and professional personnel, a procedure for updating personnel files and the establishment of a joint employee/management committee to deal with and resolve minor (less than grievable) problems.

"Games and Parks employees will tell you COL-

LECTIVE BARGAINING IS A VERY GOOD THING. Vote for representation by NAPE on May 22!''

Appellant contends the statements and claims made in the aforementioned article were untrue and may have influenced the vote of the eligible voters in the election, and, therefore, the election should be voided and set aside. On the other hand, NAPE contends there were no material misrepresentations in the article, and, in any event, appellant failed to establish by any evidence at the trial that any misrepresentations contained in the article in question influenced any of the voters, or in any way affected the result of the election. In its order entered following a hearing upon the objections filed by the appellant, the Court of Industrial Relations found: ''As we interpret the evidence, there is *at least* a grain of truth in the claims made in the newsletter.'' (Emphasis supplied.) The evidence adduced in connection with the items in question was somewhat conflicting and subject to different interpretations. The principal misrepresentation claimed by appellant is contained in paragraph 1 of the article with reference to the ''cash advance'' system allegedly obtained by the Game and Parks Commission. Dissatisfaction had been voiced by employees of that department with reference to them having to advance travel and expense money in the performance of their duties and the necessity of waiting for a reimbursement thereafter. John Russell, the chief of labor relations for the State Department of Personnel, testified at the hearing that no agreement was reached upon a cash advance system of payment, but only an agreement to consider an ''expense payment'' system. The language appearing in paragraph 1 of the newsletter specifically stated: ''It now appears that Game and Parks *will have bargained* a cash advance system for travel by December 1 of this year.'' (Emphasis supplied.) The record also reveals that the possibility of a ''credit card'' system was discussed dur-

ing the negotiation sessions. In any event, the distinction between the alleged misrepresentation and the actual statement contained in the article is obvious. It should also be noted that the actual contract entered into with the Game and Parks Commission stated that the Game and Parks Commission would attempt to establish such a system by December 1, 1978, subject to approval from the Department of Administrative Services.

With regard to the statements contained in paragraph 2 of the newsletter with reference to the establishing of "discover" procedure in grievance cases, appellant argues that procedure is already available to state employees under the personnel rules and regulations of the State of Nebraska. However, it appears from the record that there may be a question of whether those rules are applicable to the employees of the Game and Parks Commission, and, also, there may have been some significant procedural changes between the discovery procedure in the personnel rules and those finally contained in the contract with the Game and Parks Commission.

Paragraph 3 of the newsletter alleges the success of the Game and Parks Commission in bargaining for additional funeral leave and vacation leave. The article clearly states: "This has now become a part of all state government personnel policies — THUS WE ARE NOW SHARING THE RESULTS OF COL-LECTIVE BARGAINING ACHIEVED BY ANOTHER STATE AGENCY." With regard to additional vacation leave to clear up estate matters following a funeral, the evidence shows that the contract with the Game and Parks Commission provides that an employee's request for up to 10 days of vacation leave may not be "unreasonably denied." This is a slight variance from the rule as contained in the personnel rules.

Finally, paragraph 4 of the newsletter appears to

be a "catchall" for a number of minor matters allegedly the result of collective bargaining by NAPE on behalf of the Game and Parks Commission. The only witness testifying with reference to these latter matters was John Russell, the chief of labor relations for the State Department of Personnel. In his testimony, Russell admitted he was not familiar with the terms of the contract with the Game and Parks Commission as they modified the personnel rules and regulations which existed at the time of the negotiations of the contract, and had no knowledge whether the terms of the '77-78 contract included broader paid training programs for both support and professional personnel or whether it included procedures for updating personnel files which were different from the personnel rules and regulations at that time, but testified nothing was agreed upon that violated the personnel rules and regulations. As previously stated, the Court of Industrial Relations specifically found "[T]here is *at least* a grain of truth in the claims made in the newsletter." (Emphasis supplied.)

However, even assuming the statements contained in the newsletter were in some respects inaccurate and not completely true and, perhaps, to some extent misleading, we now examine the existing law with reference to the effect of false misleading statements in elections in labor matters, and whether, under the evidence in the record in this case, it is necessary to void the election in question.

The question involved appears to be one of first impression in this state, and we have been unable to find any Nebraska cases or statutes specifically dealing with the problem. In this situation, however, we have frequently considered decisions and opinions issued by the National Labor Relations Board to afford us guidance. In American Fed. S., C., & M. Emp. AFL-CIO v. County of Lancaster, 196 Neb. 89, 241 N. W. 2d 523 (1976), we stated: " 'In

reaching its decision the Court of Industrial Relations found that decisions under the National Labor Relations Act were helpful but not controlling upon the court. We think this is a correct statement as to the consideration to be given to the decisions under the federal law.' '' See, also, City of Grand Island v. American Federation of S. C. & M. Employees, 186 Neb. 711, 185 N. W. 2d 860 (1971).

With the above limitations in mind, we now examine the position of the National Labor Relations Board in connection with the recurring problem of misrepresentations in elections for bargaining representatives. For many years, the National Labor Relations Board took the position that false statements, which constituted an interference with free choice, either for or against the bargaining representative, constituted grounds for setting aside a representation election. 48 Am. Jur. 2d, Labor and Labor Relations, § 798, p. 639; Hollywood Ceramics Company, Inc., 140 NLRB 221 (1962). In its decision in that case, the National Labor Relations Board stated: "The Board has limited its intervention to cases of this type because an election by secret ballot, conducted under Government auspices, should not be lightly set aside, and because we realize that additional elections upset the plant routine and prevent stable labor-management relations. We are also aware that absolute precision of statement and complete honesty are not always attainable in an election campaign, nor are they expected by the employees. * * * We believe that an election should be set aside only where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election. However, the mere fact that a

message is inartistically or vaguely worded and subject to different interpretations will not suffice to establish such misrepresentation as would lead us to set the election aside. Such ambiguities, like extravagant promises, derogatory statements about the other party, and minor distortions of some facts, frequently occur in communication between persons. But even where a misrepresentation is shown to have been substantial, the Board may still refuse to set aside the election if it finds upon consideration of all the circumstances that the statement would not be likely to have had a real impact on the election. For example, the misrepresentation might have occurred in connection with an unimportant matter so that it could only have had a *de minimis* effect. Or, it could have been so extreme as to put the employees on notice of its lack of truth under the particular circumstances so they could not reasonably have relied on the assertion. Or, the Board may find that the employees possessed independent knowledge with which to evaluate the statements.''

However, in 1977 the board reversed its position on this question, holding that misleading campaign statements in which employees decide whether a union will represent them in collective bargaining will not necessarily void an election. ''The assumption, said the Board, that misleading campaign propaganda will interfere with employees' freedom of choice is completely unverified, and the Board will view employees as mature individuals who are capable of recognizing campaign propaganda for what it is and discounting it.'' 48 Am. Jur. 2d, Labor and Labor Relations, § 798, p. 639; Shopping Kart Food Market, 228 NLRB 1311 (1977). Two of the five members of the board that sat upon it and rendered the decision in that case filed dissenting opinions. We quote from the majority opinion in that case: ''In sum, we decide today that the Board will no longer probe into the truth or falsity of the parties'

campaign statements. Accordingly, we hereby overrule Hollywood Ceramics. * * * Despite the many difficulties in administering the Hollywood Ceramics rule, we, too, would nevertheless choose to continue to adhere to it if we shared the belief that employees needed our 'protection' from campaign misrepresentations. * * * Based on assumptions of employee behavior which we find dubious at best and productive of a host of ill effects, we believe that on balance the Hollywood Ceramics rule operates more to frustrate free choice than to further it and that the purposes of the Act would be better served by its demise. Accordingly, we decide today that we will no longer set elections aside on the basis of misleading campaign statements. However, Board intervention will continue to occur in instances where a party has engaged in such deceptive campaign practices as improperly involving the Board and its processes, or the use of forged documents which render the voters unable to recognize the propaganda for what it is. While the former standard represents no change in Board law, by our adoption of the latter we choose to revert to our earlier policy of setting an election aside not on the basis of the *substance* of the representation, but the deceptive *manner* in which it was made. * * *."

Apparently, there was a change in the membership of the board between April 8, 1977, on which date the board issued Shopping Kart, and December 6, 1978, when the board issued its decision in General Knit of California, Inc. and United Steelworkers of America, AFL-CIO, 239 NLRB No. 101, 1978-79 CCH NLRB, par. 15,317, p. 28,616. In General Knit, the board overruled its 1977 decision in Shopping Kart in which it had limited remedial action to deceptive practices that involved use of NLRB processes or forged documents, or an "egregious mistake of fact," and reverted to its policy toward election campaign misrepresentations enunciated in Holly-

wood Ceramics, to the effect that an election should be set aside only where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election. We note that the Shopping Kart case was heard before members Penello, Walther, and Murphy, who wrote the majority and a concurring opinion, and before members Jenkins and Fanning, who dissented. The General Knit case was heard before members Fanning, Jenkins, and Truesdale, representing the majority, and with Penello and Murphy writing vigorous dissenting opinions, pointing out the beneficial results that had accrued even during the short time Shopping Kart was in existence and also pointing out statistically that the decisions of the Board had been reversed by the courts on appeal at least 50 percent of the time.

With reference to court decisions, our research discloses that the two most recent decisions discussing the Shopping Kart case are Oshman's Sporting Goods, Inc. v. N. L. R. B., 586 F. 2d 699, decided November 20, 1978, by the United States Court of Appeals, 9th Circuit; and N. L. R. B. v. Wagner Elec. Corp., 586 F. 2d 1074, decided by the United States Court of Appeals, 5th Circuit, on December 26, 1978. In Oshman's Sporting Goods the court stated: "In Shopping Kart Food Market, Inc., 1977, 228 NLRB 1311, the Board has announced that it 'will no longer probe into the truth or falsity of the parties' campaign statements,' thus accepting, in part, the conclusions of the study.

"It is tempting to us to seize upon the study and go farther than the Board did in Shopping Kart, holding that we will no longer sustain orders setting aside elections, or set aside orders sustaining them,

in cases of threats as well as in cases of claimed misrepresentations in election campaigns. However, we resist the temptation because it is the Board, not the courts, that is presumed to be expert in this field."

In N. L. R. B. v. Wagner Elec. Corp., *supra*, the court, after setting forth the holding of Shopping Kart, continued: "Shopping Kart could, of course, be applied to this case because of the rule that an intervening change in the law while a case is on appeal will be applied by the appellate court. However, as in NLRB v. J. C. Penney Co., Inc., 5 Cir. 1977, 559 F. 2d 373, 377, we do not base our decision on the less restrictive standard established in Shopping Kart, because the misstatements of the effective dates of the cost-of-living increases were not sufficiently material or significant to trigger the Hollywood Ceramics standard."

Because of the unsettled state of the law in this very important area, as indicated by the foregoing authorities, we do not deem it advisable *at this time* to adopt either of the foregoing standards discussed above, nor are we required to follow them. It would appear, as pointed out by plaintiff-appellee NAPE in its brief, that it is fairly inferable from the opinion issued by the Court of Industrial Relations in this case that it has developed a standard which is somewhere between the Hollywood Ceramics philosophy and the new Shopping Kart philosophy, which standard appears to be that where there are material misrepresentation of relevant facts and where there is evidence that those misrepresentations influenced the voters or had a substantial impact on the outcome of the election, the Court of Industrial Relations would set aside the election. In this case, however, the Court decided that the newsletter did not contain material misrepresentations of relevant issues and that there is no evidence of either influence upon the voters or a substantial impact on the

election. We see no reason to depart from the standard adopted by the Court at this time. The evidence in this case convinces us that the misrepresentations claimed by appellant are not of an egregious nature, and while it is true appellant was probably not afforded a proper interval of time to answer the alleged misrepresentations, which should in future cases be done, in the absence of any proof as to the effect of those representations upon the voters involved or the outcome of the election, or any compelling reason to indulge in a per se rule or presumption in this regard, notwithstanding the nature of the misrepresentations, we conclude that no compelling reason exists for setting aside the election in this case.

Our scope of review on appeals from orders and decisions of the Court of Industrial Relations was recently set out in American Assn. of University Professors v. Board of Regents, 198 Neb. 243, 253 N. W. 2d 1 (1977), as follows: "We now hold that review by this Court of orders and decisions of the Court of Industrial Relations is restricted to considering whether the order of that court is supported by substantial evidence justifying the order made, whether it acted within the scope of its statutory authority, and whether its action was arbitrary, capricious, or unreasonable. To the extent prior cases hold that appeals from the Court of Industrial Relations are heard de novo in this court, they are overruled."

We conclude that there was substantial evidence in the record to support the decision of the Court of Industrial Relations, that it acted within the scope of its statutory authority, and that its action was not arbitrary, capricious, or unreasonable.

We have also examined appellant's second assignment of error to the effect that the Court failed to follow its own rules of procedure in entering a decision in the case on the ground that at the conclusion of the hearing on June 28, 1978, the hearing

judge granted the parties 14 days to file briefs. The State's brief was filed with the Court on July 12, 1978, 14 days later; the order entered in the case was "Entered" July 11, 1978, 1 day before the State's brief was filed, but was not filed until July 12, 1978. NAPE's brief was filed with the Court on July 13, 1978. Rule 15D of the Rules of the Court of Industrial Relations provides: "Cases shall be deemed submitted to the Court and the hearing thereon deemed concluded ten days after the last brief day set for the parties by the Court." NAPE points out, however, that there is nothing in the record with reference to any brief date being suggested or ordered by the Court, any evidence as to whether Judge DeBacker did or did not read appellant's brief, nor is there any demonstration of prejudice experienced by appellant under the circumstances. We deem this assignment of error to be without merit, and, at the most, to constitute harmless error under section 25-853, R. R. S. 1943.

We also note that on November 28, 1978, appellant filed a motion in this court requesting an order directing that all materials filed with this court by the clerk of the Court of Industrial Relations, in excess of the materials required by the rules of this court and the appellant's praecipe, be removed from the record in this case and the appellant not be held responsible for any costs incurred in the creation and filing of the bill of exceptions and exhibits for the hearing held on July 19, 1977, and the bill of exceptions for the hearing held May 4, 1978. The bill of exceptions for the hearing on the objections to the election, held June 28, 1978, reveals that at the end of said hearing the following transpired: "THE COURT: * * * Anything more, Mr. Brown? MR. BROWN: No. THE COURT: Do you have any witnesses, Mr. Burns? MR. BURNS: The only thing I would like to do is to submit to the Court a part of the record of the Court in this case dealing

with the issue of the names and addresses to be supplied by the respondent to the partitioner [sic]. And I would ask that those documents of the Court be entered as an exhibit and also the rulings of the Court thereon. THE COURT: A hearing was held with respect to that problem, was there not? MR. BURNS: Yes. THE COURT: The record made at the time of that hearing and at any previous hearing in this matter is a continuing record along with this one, does that satisfy your request? MR. BURNS: Yes it does." All of the foregoing transpired in the presence of Mr. Brown, attorney for appellant, and with no apparent objection. That being so, we do not feel we can in good conscience sustain appellant's motion, and take upon ourselves the burden of editing out the material objected to by counsel without any specification to the court of what that might be, and the reasons therefor. Appellant's motion will be overruled.

No reversible error appearing in the record, the decision of the Court of Industrial Relations must be affirmed.

AFFIRMED.