AMERICAN FEDERATION OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES LOCAL 2088, APPELLEE, V.
COUNTY OF DOUGLAS ET AL., APPELLANTS.

304 N.W.2d 368

Filed April 10, 1981. No. 43141.

Nelson & Harding, Donald L. Knowles, Douglas County Attorney, H. L. Wendt, and John J. Reefe, Jr., for appellants.

John B. Ashford of Bradford & Coenen for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, BRODKEY, WHITE, and HASTINGS, JJ., and MORAN, District Judge.

KRIVOSHA, C.J.

The appellants, the County of Douglas, Douglas County Social Service Administration, the State of Nebraska, and State of Nebraska Department of Public Welfare, as coemployers (Douglas County), appeal from an order entered by the Commission of Industrial Relations (CIR) fixing compensation to be paid to certain employees of Douglas County employed by the Douglas County Social Service and represented by American Federation of State, County and Municipal Employees Local 2088 (county employees). For reasons more specifically set out hereinafter, we find that we must reverse the order of the CIR and remand the matter to the CIR for further proceedings, if necessary.

American Federation of State, County and Municipal Employees Local 2088 (AFSCME), has been the collective bargaining agent of certain of the employees of Douglas County Social Service Administration since 1973 when it was voluntarily recognized by Douglas County. A collective bargaining agreement was entered into between Douglas County and AFSCME, which remained in effect until July 1, 1976.

On May 5, 1976, prior to the termination of the collective bargaining agreement, this court determined that county-level welfare employees were jointly employed by the State Department of Welfare as well as the respective counties. See *American Fed. of S., C. & M. Emp., AFL-CIO v. County of Lancaster,*

196 Neb. 89, 241 N.W.2d 523 (1976).

Apparently, by reason of our decision, Douglas County refused to negotiate a new contract with AFSCME without the State, and the State refused to recognize AFSCME. A petition for recognition was filed by AFSCME with the CIR. The CIR then joined all the counties of the state as party defendants.

After a hearing, the CIR determined that the appropriate bargaining unit for the county divisions of welfare was a county-by-county unit. An election was ordered in Douglas County. The State had favored a statewide unit. Before an election could be held, the State appealed. This court affirmed the decision of the CIR on July 5, 1978. See *American Fed. of S., C. & M. Emp. v. Counties of Douglas & Lancaster*, 201 Neb. 295, 267 N.W.2d 736 (1978). The AFSCME unit was subsequently elected as collective bargaining representative for Douglas County Social Service employees and proceeded to negotiate wages for 1979-80. Negotiations proceeded until April of 1979 when an impasse developed. After that, Douglas County took the position that no bargaining could take place concerning wages and fringe benefits because these issues were precluded from bargaining due to the state pay plan and Joint Merit System rules and regulations. As a result of the impasse, a petition was filed by AFSCME with the CIR.

Thereafter, Douglas County reconsidered its position and returned to the bargaining table. No agreement could be reached, however, and the action then pending before the CIR was reopened. Both parties presented evidence to the CIR, including various surveys taken of other communities.

Due to the apparent fact that the employees of Douglas County fall into two separate categories, i.e., (1) professional and (2) hourly and clerical workers, different surveys were offered for the two classifications. Both parties used a local survey for hourly and clerical employees and a national survey for

professional-level employees. In addition, Douglas County offered a statewide survey for each category, which the CIR rejected. Douglas County offered its data from what was defined in the record as Standard Metropolitan Statistical Areas (SMSA). Douglas County employees, on the other hand, submitted surveys developed in counties having principal cities similar to the Douglas County/Omaha configuration. Douglas County also tendered one or more Omaha-based employers, other than Douglas County, as comparable on the professional level, and included in its tender for the hourly and clerical employees Omaha-based employers engaged in the insurance and banking industries.

After analysis, the CIR arrived at one array for the professional employees and one array for the hourly and clerical employees. The array developed by the CIR for the professional employees consisted of the counties of: Pulaski, Arkansas; Peoria, Illinois; Polk, Iowa; Tulsa, Oklahoma; Dane, Wisconsin; El Paso, Colorado; Allen, Indiana; Mahoning, Ohio; Jackson, Missouri; and Sedgwick, Kansas. The array for the hourly and clerical workers determined by the CIR consisted solely of employers in the Omaha/Council Bluffs area who were all public employers, nonprofit social service agencies, and nonproprietary hospital corporations. With regard to the professional employees, the CIR rejected as comparables wages paid by Omaha-based employers other than Douglas County to professional employees "for the reason that the consistent low level of salary indicates some non-verbalized difference in the situation of these employers which would make the work, skills and working conditions not comparable." With regard to the hourly and clerical employees, the CIR rejected the banking and insurance employers because, by doing so, "we have a manageable array, having the logical consistency of being public employers, nonprofit social service agencies, and non-proprietary

hospital corporations as its base. The inclusion of banks, insurance companies and a miscellaneous service company does not fit with the other categories."

Following its development of the arrays, the CIR entered an order on November 14, 1979, setting the wages for both professional and hourly and clerical employees, all as was more particularly set out in its order. The CIR then compared the fringe benefits and concluded that no adjustment was required for holidays, vacation, health, dental or life insurance, pension amounts, or pension contributions. The CIR did find that Douglas County's accumulation of sick leave was out of step with that obtained in the sample comparables and adjusted the sick leave by increasing the accumulation from 156 days to 185 days.

Douglas County has appealed from that order, assigning some 32 errors allegedly committed by the CIR in entering its order. We now find ourselves, in April of 1981, seeking to determine the appropriate wages to be paid certain employees of Douglas County for the period August 1, 1979, to and including July 30, 1980.

While Douglas County has listed numerous errors, in fact, the critical one concerning the appropriate array for each group may be considered under a broader grouping and a number may be disregarded in view of the action taken by the court in this matter.

Before proceeding, however, to examine the principal assignment necessary for consideration, we believe it is helpful if we once again articulate the rules by which this court reviews the action of the CIR. As recognized by Douglas County in its brief, the standard of review by this court of orders and decisions of the CIR is generally restricted to considering whether the CIR order is supported by substantial evidence, whether the CIR acted within the scope of its statutory authority, and whether its action was arbitrary, capricious, or unreasonable. *State Coll. Ed. Assoc. & Chadron State Coll. v. Bd. of Trustees*, 205 Neb. 107,

286 N.W.2d 433 (1979); *Nebraska Assn. of Public Employees v. State*, 204 Neb. 165, 281 N.W.2d 544 (1979); *American Assn. of University Professors v. Board of Regents*, 198 Neb. 243, 253 N.W.2d 1 (1977). Moreover, we have held that determinations made by the CIR in accepting or rejecting claimed comparables are within the field of expertise of the CIR and should be given due deference. See *Fraternal Order of Police v. County of Adams*, 205 Neb. 682, 289 N.W.2d 535 (1980).

Turning then to the first group of errors assigned by Douglas County, and the one which we believe to be the most critical to our decision, we find a contention by Douglas County that the CIR erred in establishing the array upon which it determined comparables for both professional and nonprofessional employees.

There is no dispute that the CIR was acting within its statutory authority when taking such action. Under the provisions of Neb. Rev. Stat. § 48-811 (Reissue 1978), whenever any public employer and public employee or labor organization find themselves in an industrial dispute with regard to matters such as wages and fringe benefits, either party may invoke the jurisdiction of the CIR.

Neb. Rev. Stat. § 48-818 (Reissue 1978) provides that the CIR may establish or alter the scale of wages, hours of labor, or conditions of employment, or any one or more of the same. In making such finding, the act requires that the CIR establish rates of pay and conditions of employment "which are comparable to the prevalent wage rates paid and conditions of employment maintained for the same or similar work of workers exhibiting like or similar skills under the same or similar working conditions." While the language of the act is extremely clear and concise, the manner in which the CIR is to determine what is comparable to the prevailing wage rate is, under the act, left to a large extent to the discretion of the

CIR. See *Lincoln Fire Fighters Assn. v. City of Lincoln*, 198 Neb. 174, 252 N.W.2d 607 (1977).

The act does not define "comparable" nor specifically direct the CIR in the manner in which it is to make its determination. Our decisions, however, have to some extent given guidance to the CIR. In *Omaha Assn. of Firefighters v. City of Omaha*, 194 Neb. 436, 440-41, 231 N.W.2d 710, 713-14 (1975), after first quoting the provisions of § 48-818, we said: "That portion of the statute remains after an amendment by the Legislature in 1969 deleted language which restricted comparisons to 'the same labor market area and, if known, in adjoining market areas within the state and which in addition bear a generally comparable relationship to wage rates paid and conditions of employment maintained by all other employers in the same labor market area.' . . . A prevalant [sic] wage rate to be determined by the Court of Industrial Relations must almost invariably be determined after consideration of a combination of factors. . . . Under section 48-818, R.R.S. 1943, in selecting cities in reasonably similar labor markets for the purpose of comparison in arriving at comparable and prevalent wage rates the question is whether, as a matter of fact, the cities selected for comparison are sufficiently similar and have enough like characteristics or qualities to make comparison appropriate. Those determinations here were within the field of expertise of the Court of Industrial Relations, were made after a consideration and comparison of all the evidence, and the methods of selection and comparison were in accord with the requirements of section 48-818, R.R.S. 1943."

Likewise, in the case of *Crete Education Assn. v. School Dist. of Crete*, 193 Neb. 245, 252-53, 226 N.W.2d 752, 757 (1975), we attempted to define the word "comparable," saying: "Webster's Third New International Dictionary (Unabr.), p. 461, defines the word 'comparable' as having enough like character-

istics or qualities to make comparison appropriate. However section 48-818, R.R.S. 1943, further refines the definition of 'comparable' and specifies certain items to be considered in determining comparability under that section. The definition as set forth in the above section is, of course, controlling."

We then stated at 255, 226 N.W.2d at 758-59: "The Court of Industrial Relations should not be compelled to compare the same school districts in every case that comes before it involving the same school districts. The ultimate question is whether, as a matter of fact, the school districts selected for comparison are sufficiently similar to the subject district to fulfill the requirements of section 48-818, R.R.S. 1943. If they are, then there is no room for complaint. We are not prepared to say that merely because one set of school districts was deemed adequate in one case, a different set of school districts would necessarily be inadequate in a different case, particularly where different evidence is adduced."

It appears to us that what we have said with regard to school districts is equally applicable with regard to other governmental subdivisions. As a general rule it may be said that factors most often used to determine comparability are geographic proximity, population, job descriptions, job skills, and job conditions. See *Lincoln Fire Fighters Assn. v. City of Lincoln*, *supra*. Of necessity, attempting to arrive at comparables requires granting some discretion to the CIR; and unless there is no substantial evidence upon which the CIR could have concluded that the counties used by the CIR did, indeed, provide comparables, we may not as a matter of law disallow the action taken by the CIR.

The difficulty in attempting to second-guess the CIR is made apparent when one examines the arguments presented by both of the parties to this action. Each maintains that its particular array was the more appropriate one for reasons urged by that party.

There is, however, no scientific basis upon which one can conclude that one argument is more compelling than the other or that one array is better than the other. We therefore conclude that the CIR did not act arbitrarily or capriciously in using the communities it did in fact use in attempting to arrive at comparable wages.

The rejection by the CIR, however, of other Omaha-based employers of professionals and its further rejection of data concerning hourly and clerical workers employed by Omaha-based employers engaged in the insurance and banking industry pose a different problem and the one upon which we must find the CIR erred.

In *Omaha Assn. of Firefighters v. City of Omaha*, 194 Neb. 436, 440, 231 N.W.2d 710, 713 (1975), we noted: "Prevalent wage rates must of necessity be established by nonlocal comparisons whenever the public employer is the only employer for a specified type of work in a local labor market." It appears to us that it must therefore logically follow that where there are local comparisons which can or should be made, they may not be disregarded if in fact it appears from the evidence that the local employers are comparable in that they meet the requirements of § 48-818. In the instant case, the CIR rejected other Omaha-based employers of professionals performing duties which on their face appeared to be similar to those performed by employees of Douglas County because, as previously noted, "the consistent low level of salary indicates some non-verbalized difference in the situation of these employers which would make the work, skills and working conditions not comparable." The difficulty with that conclusion, however, is that the CIR has apparently determined that the work cannot be similar because the salaries are lower than what the CIR perceives the salary should be. In essence, then, the CIR has made a finding based upon a conclusion which, as the CIR acknowledges, is not supported by

the evidence and is nonverbalized. It may very well be that the CIR is correct in its ultimate conclusion and evidence would disclose that there are sufficient dissimilarities so as to explain the differences in the salaries paid to the employees of the other Omaha-based employers. We do not find, however, any basis in the record upon which the CIR could have reached that conclusion. If, in fact, the county employees believe that the CIR should not consider salaries paid to other social service professionals hired by other Omaha-based employers, then the county employees must bear the burden of producing evidence upon which the CIR may conclude that services performed by other such professionals hired by other Omaha-based employers are not sufficiently similar so as to fall within the meaning of comparable as defined in § 48-818. Until that evidence is produced, however, the CIR may not, in the first instance, rely upon "nonverbalized differences," nor can we conclude that reliance upon "nonverbalized differences" constitutes substantial evidence which would support the action taken by the CIR.

We are uncertain at this point what the effect of including these other Omaha-based employers in the array would be. Regardless of that fact, if relevant, they must be considered. Whenever there is another employer in the same market hiring employees to perform same or similar skills, the salaries paid to those employees must be considered by the CIR unless evidence establishes that there are substantial differences which cause the work or conditions of employment to be dissimilar. Having failed to consider the salaries paid by the other Omaha-based facilities, the order of the CIR in this matter must be reversed.

What we have said with regard to the professionals employed by other Omaha-based employers likewise applies to the hourly and clerical employees. Douglas County tendered to the CIR a number of Omaha-based employers to establish comparable wages for the

hourly and clerical employees. The CIR eliminated from that array private banks, insurance companies, and one miscellaneous company. The CIR concluded that a more manageable array would be arrived at if it used only public employers, nonprofit social service agencies, and nonproprietary hospital corporations as its base. There is, however, no evidence to support the CIR's conclusion that hourly or clerical nonprofessional employees performing work for Douglas County do not perform work which is the same or similar to that performed by hourly or clerical employees employed by insurance companies and banks, both of whom constitute a significant portion of the employee market in Douglas County, or that the conditions of employment are not the same or similar. We are unable to conclude how the CIR determined that other Omaha-based nonprofit employers should be disregarded for the professionals, while at the same time limiting their array to the nonprofit employers for the nonprofessionals. It appears to us that a receptionist, typist, or clerk/typist does, indeed, perform same or similar functions, whether employed by Douglas County or by an insurance company or banking institution. Again, absent evidence to show dissimilarities of work performed, or conditions, the CIR cannot create an array which is not reflective of the local labor market. Excluding private banks, insurance companies, or other private employers solely for the purpose of obtaining a manageable array, having the logical consistency of all being public employees, nonprofit social service agencies, and nonproprietary hospital corporations as its base, is not supported by substantial evidence in the record and likewise must be considered to have been arbitrary and capricious. We believe, therefore, that the CIR erred in not including insurance companies, banks, and other private employers in its array of clerical and hourly employees, absent other clear evidence establishing the contrary.

Douglas County also objects to the CIR using a "key job" classification comparison system in determining the appropriate wages for the various classes of employees. This method has been devised and adopted by the CIR and litigants practicing in this area as a simplified approach to cases which involve large numbers of job classifications. Thus, instead of compiling statistical data for each of 100 job classifications, for example, this approach allows the parties to identify "key classifications" and extrapolate wages for all of the others based on the historical mathematical relationship of the surveyed key classification to the other classifications within each line of progression.

The CIR has developed certain guidelines to be generally followed in using the "key job" classification. Those guidelines, in summary form, are: (1) Job descriptions exist or can be generated; (2) Job descriptions must match within 20 percent from one employer to another; (3) Wage rates surveyed must cover no less than 40 percent of the employees of the respondent employer; (4) Wage rates surveyed must cover not less than 20 percent of the total job descriptions of the respondent employer; (5) "Key classifications" together with related lines of progression must permit direct or computed establishment of at least 85 percent of the classes involved; (6) The "key classifications" or wage rates tendered should have at least one in each regular line of progression, or lines of progression should be established as comparable, or their relative market value established or apparent to the court from its previous experience; (7) The "key classifications" must be subject to checking for accuracy of assessment of job content; (8) The CIR will not average rates of adjustment where more than one classification is surveyed in any one line of progression; and (9) The CIR will not average percentages of all classifications surveyed in order to arrive at one overall percentage of adjustment.

Douglas County asserts that AFSCME failed to satisfy the requirements of guidelines (5) and (6) above. Appellants seem to be arguing that in order for a key classification approach to be valid at least 85 percent of the classes surveyed must be in line of progression. That is simply a misreading of guideline (5). The clear language of the guideline speaks about establishing wage rates of 85 percent of the classes involved in the employer's work force. Thus, what is required is a survey of key classifications designed so that, either by direct comparison or by extrapolated computation, wage rates may be established for 85 percent of the classes.

The positions surveyed by AFSCME, together with an additional position surveyed by Douglas County, fall just short of strict compliance with the 85 percent requirement. However, based upon traditional relationships between the clerical positions surveyed and others which were not, it appears that the CIR concluded that several nonsurveyed positions really fit within one of the clerical lines of progression. Taking that approach, the data offered allowed computation of wages for the required percentage of the job classifications.

We must not lose sight that the "guidelines" used by the CIR are not statutory requirements, and the failure of the evidence to strictly comply with the guidelines does not require us to find that the action of the CIR in developing the "key job" classification was arbitrary and capricious. Guidelines are nothing more than that — a framework whereby the CIR can reasonably develop comparable salaries for multiple positions without having to survey each position. Our examination of all the evidence in this record satisfies us that sufficient compliance with the guidelines were met so as to permit the CIR to reach the conclusions it did in using the "key job" classification.

With regard to guideline (6), it is clear that AFSCME did not have a key classification in every identified

line of progression. Those lines not represented by a key classification are listed in footnote 1 on page 2 of the CIR's opinion. The CIR, in its opinion and order, concluded: "It is apparent here that petitioner does not meet the requirement of one key class in each line of progression, since four or five lines of progression or family job groupings are ignored. [Footnote omitted.] Were it not for respondent's evidence, we would be obligated to evaluate petitioner's data to determine whether it met any of the secondary tests of requirement 6, supra. Here, however, respondent has provided data with which we can work, and we need pursue the technical requirements of a key classification no further." Thus, the requirements of guideline (6) were satisfied by all the evidence taken as a whole. And, secondly, the requirement concerning the lines of progression is only one option of that guideline. There are two other ways to satisfy the guideline. One is when lines of progression within the work force are comparable to one another so that the wages set for one can be used to determine the wages for the other. The other alternative way to satisfy guideline (6) is if the market value for the lines not represented by a key classification is established or readily apparent to the CIR from its own previous experience. Even without Douglas County's evidence, one or the other of these alternatives might have been satisfied. Certainly, a relationship between some of the clerical lines could have been found.

We affirm the use of the "key job" classification by the CIR in arriving at comparable salaries for public employees having a large number of classifications, and further affirm the use of those guidelines developed by the CIR for determining whether the evidence available permits the use of the "key job" classification.

Having so disposed of this issue, it is not necessary for us to give any further consideration to the other numerous errors assigned by Douglas County.

We do believe, however, that one further matter requires comment. Though it was not raised by either party, the record discloses that Douglas County may have granted to county employees not members of AFSCME a raise but withheld the same to members of AFSCME because of the existence of a labor dispute. We believe such practice is both improper and illegal. In a separate opinion in *Lincoln Fire Fighters Assn. v. City of Lincoln*, 198 Neb. 174, 187, 252 N.W.2d 607, 615 (1977), it was correctly observed: "'In an unregulated labor market, labor and management test their relative market power through bargaining. This testing may include resort to the strike or the lockout. However, the Legislature decided that the services provided by employees subject to [the CIR's] jurisdiction were too vital to allow interruption while employer and employees tested the merits of their claims by trial by battle. When discussion is barren, employers and employees in the public sector are routed [to the CIR]. Judicial mandate replaces economic power as the determinate of wages.'" We recognize, therefore, that the public employer and the public employee do not stand on the same footing as employers and employees in the private sector.

The policy of the public sector law in Nebraska is clear. It is to ensure "[t]he continuous, uninterrupted and proper functioning and operation of the governmental service . . . ." See Neb. Rev. Stat. § 48-802 (Reissue 1978). If, on the one hand, employees may not refuse to work without risk of discharge, employers may not refuse to pay employees the wage established by the governmental employer for such work.

Furthermore, Neb. Const. art. XV, §§ 13 and 15, would indicate that public employees may not be discriminated against or punished because they have sought collective bargaining and have reached an impasse with the public employer. In the case of *Local Union No. 647 v. City of Grand Island*, 196 Neb. 693, 244 N.W.2d 515 (1976), it was determined that

any attempt by management to dissuade employees from joining a union is an unfair and unlawful act. To withhold from employees the salary which the governmental employer has determined is at least the minimal appropriate wage for no other obvious purpose but to punish the public employee is not permitted.

Logic indicates to us that the wage to be paid for similar work during a given year to employees not involved in the dispute would be the minimum wage the employer could pay to those involved in the dispute. Any other conclusion would result in the employer favoring nondisputing employees over disputing employees, in violation of Neb. Const. art. XV, §§ 13 and 15.

As an example, if the public employee in this case were to dismiss its suit in the CIR, it would be paid at least that amount which the public employer has determined to be appropriate for all employees in a given year. We therefore fail to see how the existence of a labor dispute in the public sector can authorize the public employer to withhold from the public employee wages which the public employer has publicly declared to be, at a minimum, the appropriate wage for the job performed and to require the public employee to continue performing services at a wage which has been determined for a previous year and which, by the employer's own determination, is below the comparable wage.

It is therefore the order of this court that no public employer shall withhold pay raises otherwise determined to be granted to public employees in a given year solely on the basis that they are then engaged in a labor dispute over a previous year's wages. Such a declaration may, in fact, cause some disputes to become moot. It would occur to us that that would be in keeping with the policy of the entire act and consistent with the Legislature's desire that the public policy of this state be such that there be no interruption of public service. The action of the CIR in the

instant case is reversed and remanded for further proceedings in accordance with this opinion, if necessary.

REVERSED AND REMANDED WITH DIRECTIONS.

BOSLAUGH, J., concurs in result.