LINCOLN CITY EMPLOYEES UNION,
NATIONAL ASSOCIATION OF
GOVERNMENT EMPLOYEES, APPELLEE, V.
CITY OF LINCOLN, A MUNICIPAL CORPORATION,
ET AL., APPELLANTS.

317 N.W.2d 63

Filed March 12, 1982. No. 43615.

Dana W. Roper, Assistant City Attorney, and William A. Harding of Nelson & Harding for appellants.

J. Murry Shaeffer for appellee.

Heard before BOSLAUGH, McCOWN, CLINTON, BRODKEY, and HASTINGS, JJ.

PER CURIAM.

The appellee, Lincoln City Employees Union, National Association of Government Employees (hereafter NAGE), petitioned the Nebraska Commission of Industrial Relations (hereafter CIR) to conduct an election and to certify NAGE as the exclusive bargaining agent of certain employees of the City of Lincoln classified as "labor, labor supervision, and trades."

The appellant City of Lincoln, Nebraska (hereafter City), interposed objections, more specifically (1) that a contract already existed between the City and the employees sought to be represented, and the contract constituted a bar to an election, and (2) that the proposed bargaining unit would consist of civilian employees and police officers since the existing police union was a local of International Brotherhood of Police Officers (hereafter IBPO), a division of NAGE. A few background facts are in order.

Prior to the time the petition was filed, the City's employees were represented by the American Federation of State, County, and Municipal Employees (hereafter AFSCME), IBPO, Amalgamated Transportation Union, and the International Association of Firefighters. In addition to these unions, the City also voluntarily recognized Lincoln City Employees Association (hereafter LCEA) as a labor organization representing employees not officially represented by the unions previously mentioned.

LCEA employees negotiated wages, hours, and fringe benefits with the City and also enjoyed checkoff privileges, bulletin board privileges, and the right to process grievances. In June 1978 the City and LCEA

reached a 2-year agreement which was to expire on August 31, 1980. The terms of the agreement covered wages, health insurance, retirement, and sick leave.

Subsequent to this agreement AFSCME, which served as the exclusive bargaining agent of the employees described in the NAGE petition, was decertified in CIR case No. 261 on November 20, 1978. With the decertification of AFSCME, LCEA sent the City personnel director a letter asking the City if LCEA could be recognized as the bargaining agent for the former AFSCME employees. The City notified LCEA that the former AFSCME employees would be eligible for membership in LCEA. The City agreed to "meet and confer" with LCEA on behalf of all employees not represented by one of the other officially recognized bargaining agents, as long as the arrangement was acceptable to the affected employees. The conditions of employment extended to LCEA members were also extended to former AFSCME members.

NAGE filed its petition for election on July 31, 1979. After determining that LCEA was a necessary party to the action, a hearing was held on September 27, 1979, to determine if a contract bar existed. On October 30, 1979, the CIR ruled that: "1. A contract bar does not exist as to those employees previously represented by AFSCME and decertified on November 20, 1978, by CIR Case No. 261. The evidence adduced by the petitioner does not support a finding that these employees were bound by the contract in question or that the City Employees Association actually had any authority to represent them. 2. There does exist a contract bar as to any employees sought to be represented by the petitioner who were represented by the City Employees Association and not represented by AFSCME on September 1, 1978."

Thereafter, the City filed a motion to dismiss based on the answers to certain interrogatories the City had served on NAGE. The City's basic contention was that the Lincoln Police Union was a local of IBPO which, in

turn, was a division of NAGE. The City argued that the direct or indirect affiliation of the police union with NAGE prevents NAGE from representing former AFSCME members since this might result in guard and nonguard employees being represented by the same union.

The CIR held a hearing on November 20, 1979, and entered its order on November 21, 1979, overruling the City's motion.

By joint stipulation of the parties, a representation election was held on February 22, 1980, which resulted in the election of NAGE as the exclusive bargaining representative. The City filed an objection to the election, stating that employees other than members of the bargaining unit acted as observers for NAGE. The CIR overruled the City's motion. Thereafter, the City filed a motion for new trial, which was overruled. The City then filed a notice of appeal to this court. After the bill of exceptions and transcript were docketed in this court, the City filed another motion for new trial based on newly discovered evidence. The CIR found that it was without jurisdiction and the City filed a supplemental praecipe to have the motion filed with this court.

The standard of review by the Supreme Court of orders and decisions of the CIR is generally restricted to considering whether the CIR's order is supported by substantial evidence, whether the CIR acted within the scope of its statutory authority, and whether its action was arbitrary, capricious, or unreasonable. *AFSCME Local 2088 v. County of Douglas*, 208 Neb. 511, 304 N.W.2d 368 (1981).

There is substantial evidence in the record that a contract bar did not exist. The following testimony of Walter J. Mitchell, personnel director for the City, strongly supported the CIR decision. The following questions and answers were elicited at the September 27, 1979, hearing: "Q In your agreements which you reached with formal labor unions, that agreement flows to only certain employees of the City of Lincoln desig-

nated in that contract. A That's right. Q When this agreement was reached with City Employees Association in June of 1978, to whom did those benefits accruing under that agreement flow? A Everybody who wasn't represented by one of the formal agreements that you're talking about, other than the unclassified employees. Q Those benefits did not flow, at that time, to members of the AFSCME bargaining unit? A No, because — That's right. The answer is no. Q At the time that these ordinances were passed which were introduced in September or October of 1978, the benefits agreed to with CEA also were not ratified as benefits for the AFSCME employees? A Not at that time. Q Since that time, since the ordinances were passed, there have been no negotiations between CEA and the City of Lincoln for the benefit of the former AFSCME bargaining group employees. A That's right."

It is not disputed that at the time LCEA was negotiating the June 1978 contract it was not representing any of the AFSCME members. An agreement was reached and the contract was ratified before AFSCME was decertified. At the time the contract was negotiated, it was never the intention of LCEA or the City that AFSCME members would be covered by the contract. Under these facts and circumstances, we cannot say that a contract bar exists. Therefore, the CIR order of October 30, 1979, is correct.

The City contends that the new Lincoln City Employees Union and the Lincoln Police Union are directly or indirectly affiliated with each other. The City contends that this affiliation violates well-established Nebraska law that bargaining units may not include both guard and nonguard employees, nor may unions admitting guards into membership also represent for purposes of collective bargaining nonguard employees, citing *University Police Officers Union v. University of Nebraska*, 203 Neb. 4, 277 N.W.2d 529 (1979).

The City alleges that NAGE exercised pervasive control of its local union. However, the City offers no

evidence that the Lincoln Police Union is being controlled by NAGE. In fact, the record contains evidence which conflicts with this contention. Dennis A. Duckworth, president of the Lincoln Police Union, gave the following testimony: "Q In conjunction with your job as a police officer, do you hold another position associated with that job? A Yes, I do. Q What is that? A I am president of the union for the police officers. Q Have you held other offices or performed other functions for the Lincoln Police Union during your membership in the union? A Yes, I have. Q What were those? A I was on the negotiating team that negotiated the contract that we are now operating under with the City. Q Would you explain to the Commission how the initial requests of the union were prepared, and any help that you might have had in preparing the request for contract negotiations? A The negotiations, what we want in the contract is just what each of the officers might come up with. They are presented to the negotiating team by the officers. We go over them then, and the negotiating team presents these offers to the City. Q The Lincoln Police Union is associated with the International Brotherhood of Police Officers, is it not? A Yes, it is. Q And it is a local of the International Brotherhood of Police Officers? A Yes, it is. Q The International Brotherhood of Police Officers is a division of an organization known as the National Association of Government Employees? A That's correct. Q During the process of negotiations and preparations for negotiations by the Lincoln Police Union, were the terms or conditions, or were suggestions made, by International Brotherhood of Police Officers, as to what had or should be in your contract? A No, it wasn't. Q Did the terms to be negotiated in the contract deal with anything other than the local situation within the Lincoln Police Department? A No. It was strictly with the local. Q You are aware that the National Association of Government Employees are attempting to represent a group of civilian employees of the City of Lincoln, are you not? A Yes, I am. Q Have

you, in any way, helped with that organization? A No, I haven't. Q Have you talked with any civilian employees of the City of Lincoln about becoming members of the National Association of Government Employees? A No, I have not. Q According to the bylaws of the Lincoln Police Union and the International Brotherhood of Police Officers, could a civilian employee of the City of Lincoln become a member of either the Lincoln Police Union or the International Brotherhood of Police Officers? A No, they could not. Q Who specifically does the Lincoln Police Union, as a local of the International Brotherhood of Police Officers, represent in negotiations? A Police officers only, of the rank of Police Officer, Sergeant, Detective and Lieutenant. Q Are any civilians represented by the union? A No, they are not. Q Was the Lincoln Police Union, as Local 544 of the International Brotherhood of Police Officers, able to secure a contract with the City of Lincoln? A Yes, they were. Q Is that contract presently in effect? A Yes, it is. Q When does that expire? A It expires August 31, 1980. Q Does the Lincoln Police Union, Local 544 of the International Brotherhood of Police Officers, or is it attempting to, represent anybody other than police officers at this time? A No, it is not. Q Has the Lincoln Police Union actively engaged or passed any resolutions to help in the organization of the civilian City employees of the City of Lincoln? A No, we have not."

This testimony indicates the separateness of the two local unions. The argument by the City that the NAGE constitution would obligate the Lincoln Police Union to honor a picket line by the Lincoln City Employees Union is not convincing. Neb. Rev. Stat. § 48-821 (Reissue 1978) specifically prohibits government employees from striking.

In light of this, absent a sufficient showing in the record of the dependence upon one another or the lack of freedom and independence in formulating their own policies and deciding their own course of action, this court will not find a direct or indirect affiliation be-

tween the two unions. The mere fact that each local union can be traced back to a common international union will not be enough to show that the locals are affiliated with each other. There must be a positive showing that the national has authority and power to exercise control over both locals and that it is actually exercising that control. Here, there is evidence that the locals are controlling their own activities. The international union was used only in the formative stages of the locals. Also, no civilian employees are allowed to become members of either IBPO or the Lincoln Police Union. Although not controlling on us, we find support for our position in *Bally's Park Place*, [1980-81] 5 Lab. Rel. Rep. (CCH) ¶ 18,314 at 29, 627-28, 107 L.R.R.M. 1580, 1581, wherein it was stated: "The Board has consistently ruled that a guard union is 'affiliated indirectly' with a nonguard union within the meaning of Section 9(b)(3) of the Act, where 'the extent and duration of [the guard union's] dependence upon [the nonguard union],' or vice versa, 'indicates a lack of freedom and independence in formulating its own policies and deciding its own course of action.' Thus, the Board has permitted substantial latitude when a guard union is assisted by a nonguard union merely during the former's formative stages. However, where the assistance rendered continues beyond the formative stages, the Board has found an indirect affiliation between guard and nonguard organizations."

The record does not reflect sufficient evidence that NAGE is controlling either local or that the locals were not acting independently. This is not to say that the Lincoln City Employees Union cannot be decertified in the future if it is shown later that NAGE is actually controlling it or that the Lincoln City Employees Union and the Lincoln Police Union are not acting independently. The evidence supports the decision of the CIR and it is therefore affirmed. We find no merit in the other assignments and therefore we do not discuss them.

AFFIRMED.

KRIVOSHA, C.J., disqualified.

WHITE, J., participating on briefs.