LINCOLN FIREFIGHTERS ASSOCIATION LOCAL 644, APPELLEE,
v. CITY OF LINCOLN, NEBRASKA, APPELLANT.
572 N.W. 2d 369

Filed January 23, 1998.    No. S-97-310.

William A. Harding, Jerry L. Pigsley, and Neal E. Stenberg, of Harding, Schultz & Downs, and Don W. Taute, Assistant Lincoln City Attorney, for appellant.

John P. Fahey, Law Office of John P. Fahey, P.C., for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

In this industrial dispute over wages and conditions of employment for fiscal year September 1, 1995, through August 31, 1996, the respondent-appellant, City of Lincoln, challenges the determinations made by the Nebraska Commission of Industrial Relations upon the petition of the appellee, Lincoln Firefighters Association Local 644, the collective bargaining representative of certain employees of Lincoln's fire depart-

ment. Lincoln successfully sought leave to bypass the Nebraska Court of Appeals and assigns 11 errors which, in summary, assert that the commission erred in (1) selecting the array of comparable cities, (2) failing to adjust for economic variables, (3) failing to account for all fringe benefits, (4) failing to find its health insurance benefits superior to those offered by the array cities, (5) failing to find its pension benefits superior to those offered by the array cities, (6) failing to properly account for fringe benefits not provided by certain array cities, and (7) placing employees into newly established pay lines. We affirm.

## II. SCOPE OF REVIEW

In our review of orders and decisions of the commission, we are restricted to considering whether the order of that agency is supported by substantial evidence justifying the order made, whether it acted within the scope of its statutory authority, and whether its action was arbitrary, capricious, or unreasonable. *Hall Cty. Pub. Defenders v. County of Hall, ante* p. 763, 571 N.W.2d 789 (1998); *Douglas Cty. Health Dept. Emp. Assn. v. Douglas Cty.*, 229 Neb. 301, 427 N.W.2d 28 (1988); *IBEW Local 1536 v. City of Fremont*, 216 Neb. 357, 345 N.W.2d 291 (1984); *IAFF Local 831 v. City of No. Platte*, 215 Neb. 89, 337 N.W.2d 716 (1983); *AFSCME Local 2088 v. County of Douglas*, 208 Neb. 511, 304 N.W.2d 368 (1981), *modified* 209 Neb. 597, 309 N.W.2d 65; *American Assn. of University Professors v. Board of Regents*, 198 Neb. 243, 253 N.W.2d 1 (1977).

## III. FACTS

The relevant facts are presented in the course of analyzing the issues presented by Lincoln's assignments of error.

## IV. ANALYSIS

In industrial disputes involving governmental services, the commission, with an exception not relevant here, is empowered to "establish rates of pay and conditions of employment which are comparable to the prevalent wage rates paid and conditions of employment maintained for the same or similar work of workers exhibiting like or similar skills under the same or similar working conditions." Neb. Rev. Stat. §§ 48-810 and 48-818 (Reissue 1993).

Each of the matters addressed and ruled upon by the commission falls within the scope of its statutory authority; thus, the only question before us is whether each challenged aspect of its order is supported by substantial evidence and is not arbitrary, capricious, or unreasonable. *AFSCME Local 2088, supra* (commission has jurisdiction over public employment industrial disputes concerning such matters as wages and fringe benefits).

### 1. ARRAY OF COMPARABLE CITIES

In the first assignment of error, Lincoln asserts that the commission erred in selecting the array of employers to which Lincoln was compared.

### (a) Facts

The association proposed that Ann Arbor, Michigan; Davenport, Iowa; Minneapolis, Minnesota; and Peoria, Illinois, be included in the array. Lincoln proposed Des Moines, Iowa; Springfield, Missouri; and Topeka, Kansas. Both parties agreed that Cedar Rapids, Iowa, and Sioux Falls, South Dakota, were comparable. The commission included seven cities in the array: Cedar Rapids, Davenport, Des Moines, Minneapolis, Peoria, Sioux Falls, and Topeka. The commission thus selected three of the four cities proposed only by the association and two of the three cities suggested only by Lincoln. In selecting the array, the commission focused on the department's firefighting and emergency medical services duties and, contrary to the association's request, discounted the department's duties in providing hazardous materials control.

Lincoln contends that the commission should have excluded Davenport, Minneapolis, and Peoria from the array and included Springfield.

Noting that Davenport was excluded from two previous commission arrays involving Lincoln, Lincoln argues that Davenport should not have been included in the present array both because it has less than half the population of Lincoln and because it is considered part of the "quad cities" and therefore part of an area which has too great a population. In short, in Lincoln's view, Davenport is both too large and too small for an appropriate comparison. Lincoln maintains in addition that Davenport does not have emergency medical services similar to

its own, as Davenport does not require the same certification and skill level as does Lincoln. However, there is evidence that notwithstanding some differences in the emergency medical services provided by Davenport and Lincoln, the services are similar in some respects.

In contending that Minneapolis should have been excluded, Lincoln points out that whereas Minneapolis has a metropolitan population of 2,538,834, Lincoln has a metropolitan population of only 213,641, less than a tenth of that of Minneapolis. The record further reveals, however, that the population within the city limits of Minneapolis is 368,383; Lincoln has a population of 191,972 within the city limits. The commission was also presented with evidence that Minneapolis is comparable to Lincoln in geographic proximity, in job descriptions and skills for firefighters, and in job conditions.

In maintaining that Peoria should have been excluded, Lincoln points to testimony that "Peoria is not a mirror image of" Lincoln, that Peoria has a much larger manufacturing base and a smaller governmental employment base than does Lincoln, and that Peoria does not require its firefighters to be certified in the manner Lincoln requires. Again, however, the evidence as to the quality of the emergency medical services provided by Peoria is in conflict, as there is evidence that Peoria provides emergency medical services similar to that provided by Lincoln.

Finally, Lincoln urges that the commission erred in excluding Springfield from the array. Lincoln cites the commission's order, which acknowledges that Springfield is both geographically proximate and meets the size criteria and that its fire department also provides significant emergency medical services. However, the association presented evidence that Springfield's emergency medical services personnel lack equipment for bleeding control, splinting, spinal immobilization, and medical assessment and that its emergency medical services personnel function at a lower basic life support level than do Lincoln's emergency medical services personnel.

### (b) Application of Law to Facts

The basis for selecting an array is set forth in § 48-818, as noted earlier. Simply put, § 48-818 requires that the employers

selected for the comparative array must be demonstrated to be similar.

As a general rule, it may be said that the factors most often used to determine comparability are geographic proximity, population, job descriptions, job skills, and job conditions. *Douglas Cty. Health Dept. Emp. Assn. v. Douglas Cty.*, 229 Neb. 301, 427 N.W.2d 28 (1988); *AFSCME Local 2088 v. County of Douglas*, 208 Neb. 511, 304 N.W.2d 368 (1981), *modified* 209 Neb. 597, 309 N.W.2d 65. In selecting employment units in reasonably similar labor markets for the purpose of comparison as to wage rates and other benefits, the question is whether, as a matter of fact, the units selected for comparison are sufficiently similar and have enough like characteristics or qualities to make a comparison appropriate. *Lincoln Co. Sheriff's Emp. Assn. v. Co. of Lincoln,* 216 Neb. 274, 343 N.W.2d 735 (1984).

Lincoln first rests its conclusion that the populations of Davenport and Minneapolis are too dissimilar to make appropriate comparisons on the claim that the commission has long considered only array members with populations that are not less than half or more than twice the population of the compared-to employer. Lincoln further notes that after the present case was decided, the commission rejected cities from an array because they were part of a metropolitan statistical area that was not comparable to the compared-to community. Lincoln concludes from the foregoing that by failing to reject Davenport and Minneapolis in the present case, the commission was acting in an arbitrary, capricious, and unreasonable manner.

But the commission noted that it here declined to eliminate cities through reliance on metropolitan statistical area data "as there was no evidence presented to support the contention that a city's presence in a larger metropolitan area directly affected wages or work, skills and working conditions." While Lincoln presented expert testimony that cities in metropolitan statistical areas are entwined in that area's economy, it provided no evidence as to how wages or working conditions were affected or why a city in a larger metropolitan statistical area should be automatically excluded from the array. The association countered with an expert's testimony that a fire department's location in a larger metropolitan statistical area does not necessarily

make a difference. The expert also testified that a fire department is somewhat different from other employers, even from police departments, because the operations of a fire department generally stay within city limits.

The commission's determination in this regard is a factual one; thus, it could reasonably place greater reliance on that factor in one case and less reliance on it in another case. As we have observed in the past,

> We must not lose sight that the "guidelines" used by the [commission] are not statutory requirements, and the failure of the evidence to strictly comply with the guidelines does not require us to find that the action of the [commission] . . . was arbitrary and capricious. Guidelines are nothing more than . . . a framework . . . .

*AFSCME Local 2088*, 208 Neb. at 523, 304 N.W.2d at 375.

Finally, Lincoln argues that since Springfield was included in the array during both of its two previous disputes with its firefighters, it is arbitrary for the commission to exclude Springfield from the present array. But again, which employers should be included in an array is dependent upon the issues in the case in question, for it does not necessarily follow that the use of an array in a particular case requires that it be used in a subsequent case involving the same parties. See *AFSCME Local 2088, supra.*

### (c) Conclusion

Of necessity, determining comparables requires the granting of some discretion to the commission, and unless there is no substantial evidence upon which the commission could have concluded that the factors it used resulted in an appropriate array, we may not as a matter of law disallow the commission's determination. See, *Douglas Cty. Health Dept. Emp. Assn. v. Douglas Cty.*, 229 Neb. 301, 427 N.W.2d 28 (1988); *AFSCME Local 2088 v. County of Douglas*, 208 Neb. 511, 304 N.W.2d 368 (1981), *modified* 209 Neb. 597, 309 N.W.2d 65. Stated another way, determinations made by the commission in accepting or rejecting claimed comparables are within the field of its expertise and should be given due deference. *AFSCME Local 2088, supra; Fraternal Order of Police v. County of Adams*, 205 Neb. 682, 289 N.W.2d 535 (1980). The commission's determi-

nation here is supported by substantial evidence and is neither arbitrary, capricious, nor unreasonable; as a consequence, there is no merit to the first assignment of error.

## 2. ADJUSTMENT FOR ECONOMIC VARIABLES

As noted in part I, in the second assignment of error Lincoln contends that the commission erred by failing to adjust for economic variables, and argues specifically that the commission's failure to adequately account for differences in the degree of unionization in Lincoln and the degree of unionization in the array cities led the commission to set improperly high rates of pay for its firefighters.

### (a) Facts

Relying upon the degree of unionization for the states in which the array cities were located and the degree of unionization in Nebraska, Lincoln's expert concluded that there is a high degree of correlation between wages paid to firefighters and the degree of unionization in the labor market. It was the expert's personal view that there was no reason to suspect that "Lincoln is all that dissimilar from the rest of the state," but the expert admitted that if the degree of unionization in Lincoln was not the same as for the state as a whole, the calculations relating to Lincoln's variation within the array cities would change.

Lincoln's expert testified that the probabilities for chance correlations between maximum wage rates were low, 4.28 percent for public sector unionization and a very low .97 percent for private sector unionization. However, the probability for chance correlations between minimum wage rates and unionization were higher, 9.20 percent for both public and private sector unionization. The expert considered such degrees of chance correlations to be acceptable.

The association's expert found the correlation of unionization with minimum wage rates not to be statistically significant. In the association's expert's view, the probability of a chance correlation should not exceed 5 percent, a claim which Lincoln's expert specifically disputed. The association's expert was of the further view that the study made by Lincoln's expert was flawed in that the number of observations were too small to permit the use of the regression analysis relied upon by Lincoln's expert.

## (b) Application of Law to Facts

We have held that where it is alleged that economic dissimilarities exist which have a bearing on prevalent wage rates, the burden is on the party making that allegation to establish that such is the case. See *Douglas Cty. Health Dept. Emp. Assn. v. Douglas Cty., supra.* The commission found that the use by Lincoln's expert of statewide unionization data rather than city data, together with the high probability of a chance correlation between minimum wage rates and degree of unionization, made his opinions unreliable. Under the record presented, we cannot say that the commission's conclusion that Lincoln failed to prove that the degree of unionization in the array cities affected the result to Lincoln's detriment is not supported by substantial evidence or that it is arbitrary, capricious, or unreasonable. The assignment of error is therefore without merit.

### 3. MOOTNESS OF CERTAIN FRINGE BENEFITS

In the third assignment of error, Lincoln maintains that the commission wrongly considered certain fringe benefits provided by Lincoln to be moot.

Lincoln takes specific issue with respect to 7 of the 21 fringe benefits the commission treated as moot, namely, the use of sick leave for funeral leave, sick leave accumulation rate, vacation accumulation rates, funeral leave, number of employees paid to attend negotiations, amount of life insurance coverage, and personal leave.

We have previously held that in establishing wage rates under § 48-818, the commission is required to take into consideration the overall compensation received by the employees, including all fringe benefits. *Lincoln Fire Fighters Assn. v. City of Lincoln,* 198 Neb. 174, 252 N.W.2d 607 (1977). However, this does not require a dollar-for-dollar costing out of each benefit when, as here, the contract year in dispute is already past. Section 48-818 requires only that the "overall compensation" be addressed. We recognize the impossibility or impracticality of retroactively changing fringe benefits for an expired contract year, and we question the practicality of assigning a monetary value to a fringe benefit such as the number of employees allowed to participate in negotiations.

Of the 21 items mooted by the commission, Lincoln was below the prevalent in 8 of them, above the prevalent in 6 of them, and comparable in 7 of them. Under that circumstance, we cannot say the mooting of these fringe benefits when the contract year in dispute is over is arbitrary, capricious, or unreasonable. We thus find no merit to this assignment of error.

### 4. Health Insurance Benefits

In the fourth assignment of error, Lincoln claims the commission erred in comparing its health insurance benefits to those of the array cities by considering the percentage of the premium paid by the respective employers.

Lincoln urges that the comparison should be made by calculating the midpoint of the employers' monthly costs for providing health insurance. It thus computed the composite cost per month representing single, employee-spouse, and family coverage, and weighted the average based upon the number of employees enrolled in each type of plan, preferred provider and health maintenance organizations and indemnity. In general, Lincoln wished to compare employers' costs while the association wanted to compare benefits. Lincoln's method would result in a minimum economic offset of $663.72 per employee per year because it would result in a determination that Lincoln was paying that much more than the prevalent amount for health, dental, and life insurance.

Lincoln argues that the method chosen by the commission to determine comparability is misleading, pointing out that "[u]nder the percentage of premium method, an employer paying 100% of a significantly lower value medical plan would be determined to be providing a better medical plan than an employer paying 99% of a significantly higher value medical plan." Brief for appellant at 37. However, the same criticism can be made of an analysis based solely on the amount of premiums paid. Under that approach, a city paying $1,000 a month for a health plan would be credited with more economic offset than a city paying $950 a month for a health plan, even if the $950 plan offered significantly better medical coverage to employees. Lincoln does not maintain that its insurance coverage exceeds the prevalent in quality, only that its expense exceeds the preva-

lent in expense. Indeed, each party's health insurance expert opined that Lincoln's benefits were comparable to those provided by the array cities.

As the commission's determination, based on the benefits received by the employees, is supported by substantial evidence and is not arbitrary, capricious, or unreasonable, there is no merit to this assignment.

## 5. RETIREMENT BENEFITS

In the fifth assignment of error, Lincoln asserts that the commission erred in concluding that the difference between Lincoln's pension benefits and those of the array cities was so insignificant as to be comparable.

### (a) Facts

The commission was presented with two markedly different opinions. Lincoln's expert concluded that Lincoln was providing $1,298 annually above the prevalent level for pension benefits, which would place Lincoln 4 percent of the gross wage above the prevalent. The association's expert also found Lincoln's pension benefits to be above prevalent, but only by seven one-hundredths of 1 percent of payroll.

Given these contrasting analyses, the commission held that the association's analysis was more credible and that the difference between Lincoln's pension benefits and those provided by the array cities was so small as to make those of the array cities comparable.

The commission gave several reasons for its holding that the association's analysis was more credible. The association's analysis is based on a weighted average of the two pension plans currently used by Lincoln's fire department, basing the weight given each plan upon the number of employees currently enrolled in each plan. Lincoln's analysis is based only on the first of these two plans, notwithstanding that 93 percent of the firefighters in the contract year in question belonged to the second plan.

### (b) Application of Law to Facts

The key difference between Lincoln's analysis and the association's analysis is accounted for by the fact that Lincoln's

expert assumed the "average" firefighter would retire at age 50. According to the association's expert, this assumption about retirement age constitutes over 75 percent of the difference between the opinion of Lincoln's expert and that of the association's expert. Lincoln's expert made this assumption because of the "intent of the City to encourage its uniformed employees to retire at age 50." However, Lincoln's own actuarial assumptions for its firefighter plans predict only a 25-percent retirement at age 50, with 30 percent not retiring until after age 64. The assumption of retirement age is crucial because, as Lincoln itself noted, the difference between it and the array cities "becomes less significant as retirement is delayed (and might reverse if retirement is delayed long enough)." The commission noted that Lincoln's use of a retirement age of 50 as an underlying assumption in its analysis is "[o]f major concern."

Also influencing the commission's decision was Lincoln's use of the cost of living adjustment as part of the retirement benefit. It was uncontested that there is a pool of approximately $2 million dedicated toward this adjustment. However, the association's analysis did not use that money to increase the value of the pension for three reasons. First, it was not a guaranteed benefit and so it was not included in Lincoln's actuarial valuation report. Second, while the current fund will probably cover the current retirees, an investment return of over 7 percent is necessary in order to fund adjustments for the active members of the plan. Third, if a return of over 7 percent were assumed, then such a return would affect the other cities in the array, canceling out, or at least reducing, Lincoln's advantage over the array pension plans.

The commission was also critical of Lincoln's choice to increase the present value of the pension benefits because they are tax deferred. The commission considered that it was not appropriate to adjust for differing tax treatment because the benefits were tax deferred, not tax exempt.

The general rule is that the weight which should be given expert opinions is uniquely within the province of the fact finder. See, *Vredeveld v. Clark*, 244 Neb. 46, 504 N.W.2d 292 (1993) (civil action). See, also, *Toombs v. Driver Mgmt., Inc.*, 248 Neb. 1016, 540 N.W.2d 592 (1995) (workers' compensation

action); *State v. Kells*, 199 Neb. 374, 259 N.W.2d 19 (1977) (criminal action). We discern no reason that the rule should be otherwise with respect to the commission.

### (c) Conclusion

As the commission's decision that Lincoln's pension benefits are comparable to those provided by the array cities is supported by substantial evidence and is not arbitrary, capricious, or unreasonable, there is no merit to this assignment of error.

### 6. ACCOUNTING FOR UNOFFERED FRINGE BENEFITS

In the sixth assignment of error, Lincoln urges that the commission failed to properly account for fringe benefits not provided by some array cities.

While Lincoln argued that where an array city did not provide a benefit, a zero should be used in calculating the prevalent wage rate, the association successfully contended that those cities not providing a benefit should be eliminated from the calculations, and the midpoint should be determined using only those array cities that provided the benefit.

The commission ascertained whether a specific benefit is widely or generally offered within the array, that is, whether it is "prevalent." In doing so, the commission concluded that if a majority of the array does not offer a benefit, it is not prevalent, even if Lincoln offers such a benefit. The commission gave no value for a benefit offered by only a minority of cities in the array and concluded that no value should be given to the minority of cities not offering a prevalent benefit.

We cannot say that the matching of similar fringe benefits provided in order to determine a prevalent level for each separate benefit is not supported by substantial evidence or is arbitrary, capricious, or unreasonable; thus, there is no merit to this assignment of error.

### 7. PLACEMENT OF EMPLOYEES INTO PAY LINES

In the seventh and final assignment of error, Lincoln complains that the commission usurped a management prerogative by placing covered employees into newly established "pay lines," which we understand to be nothing more than graded wage-step progression schedules for particular job classifications.

## (a) Facts

The commission ordered the initial placement of all covered employees into pay lines based upon their years of service in their particular classification at the beginning of the fiscal year in question, provided the employee had not received an unsatisfactory job performance evaluation while in that job classification.

## (b) Application of Law to Facts

We have not previously addressed this precise issue. However, we did observe in *School Dist. of Seward Education Assn. v. School Dist. of Seward*, 188 Neb. 772, 784, 199 N.W.2d 752, 759 (1972), that

> [w]ithout attempting in any way to be specific, or to limit the foregoing, we would consider the following to be exclusively within the management prerogative: The right to hire; to maintain order and efficiency; to schedule work; to control transfers and assignments; to determine what extracurricular activities may be supported or sponsored; and to determine the curriculum, class size, and types of specialists to be employed.

Lincoln argues that while it conducts ongoing job evaluations of firefighters, there is no reasonable method of determining past performance for the purpose of progression on the pay lines. One of Lincoln's expert witnesses testified that "grade creep" can occur when very little is at stake in an evaluation system such as that used by the fire department. A commission member who dissented on this issue observed that as the evaluation system was implemented solely for job retention and disciplinary purposes, it would be inappropriate to use it for placement and progression of employees on a pay line. However, the majority of the commission concluded:

> It is not credible to argue that past job performance evaluations do not provide an adequate basis for determining satisfactory job performance for initial placement of bargaining unit members on pay lines in this case when [Lincoln] deems them valid for job retention and disciplinary purposes as well as for advancement of police and civilian bargaining unit members along their pay lines.

The association asked Lincoln's compensation manager several times how the current evaluation system would have to be

changed in order for it to be valid to use for progression on a pay line, but the manager could not suggest any changes; in his answer he commented only that he had not looked at it and that the evaluation system might change and it might not change. As the commission noted, "[Lincoln] has indicated no desire or intention to eliminate or modify such requirements."

Nonetheless, Lincoln further argues that there is no substantial evidence that initial placement on a pay line based on seniority is the prevalent practice. However, this argument not so subtly shifts the focus from placement of employees on a pay line that has been established by prevalent practice to the question of what is the prevalent practice for initial placement in a pay line. Lincoln is correct in concluding that there was no evidence submitted about the prevalent practice on the question of initial placement on a pay line. But there was evidence as to how cities within the array determined progression on their pay lines. Lincoln does not contest that in the comparable cities the great majority of pay progression is done automatically either by anniversary hire date or by anniversary hire date plus an acceptable evaluation.

There is no question that the commission has the statutory authority to establish wage-step progression schedules. *Nebraska Pub. Emp. v. City of Omaha*, 247 Neb. 468, 528 N.W.2d 297 (1995) (wage-step progression schedule is condition of employment which commission has been given statutory authority to establish); *Douglas Cty. Health Dept. Emp. Assn v. Douglas Cty.*, 229 Neb. 301, 427 N.W.2d 28 (1988). Section 48-818 provides that "the findings and order or orders [of the commission] may establish or alter the scale of wages . . . ." It is logical to conclude that a prevalent practice can be established on progression within a pay line and that this practice can then be applied to determine the placement on a pay line.

### (c) Conclusion

The evidence submitted here shows both the pay plans and the means used for progression by other cities in the array. Therefore, there was substantial evidence to support the commission's decision, and the decision cannot be said to be arbitrary, capricious, or unreasonable. As a consequence, this assignment of error also fails.

## V. JUDGMENT

The record failing to sustain Lincoln's assignments of error, the decision of the commission is affirmed.

AFFIRMED.