OMAHA POLICE UNION LOCAL 101, IUPA, AFL-CIO, APPELLEE AND CROSS-APPELLANT, V. CITY OF OMAHA, A MUNICIPAL CORPORATION, AND THE CHIEF OF POLICE, THOMAS WARREN, APPELLANTS AND CROSS-APPELLEES.

736 N.W.2d 375

Filed August 3, 2007. No. S-06-403.

Paul D. Kratz, Omaha City Attorney, and Bernard J. in den Bosch for appellants.

Thomas F. Dowd, of Dowd, Howard & Corrigan, L.L.C., for appellee.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

This appeal presents the issue of whether a public employer engages in a prohibited practice under the Industrial Relations Act (the Act)[1] by taking disciplinary action against public employees belonging to a labor organization for statements made and published by those employees. In this action commenced by Omaha Police Union Local 101 (Union) against the City of Omaha and Omaha chief of police Thomas Warren (collectively the appellants), the Commission of Industrial Relations (CIR) concluded that disciplinary action taken against a police officer who authored an article in a Union publication constituted a prohibited practice. In reaching this conclusion, the CIR used a legal standard applied in private sector labor relations cases. We conclude that the CIR should have applied a different standard utilized by courts and administrative agencies to resolve protected speech issues in public sector employment cases.

## I. BACKGROUND

### 1. ANDERSEN INVESTIGATION

On December 14, 2004, a Union meeting was held for the member police officers of the Omaha Police Department (OPD). During the meeting, OPD Sgt. Timothy Andersen, then president of the Union, was asked a question concerning how OPD calculated 911 emergency dispatch service response times. Andersen opined that the method by which OPD calculated response times was misleading. In expressing his view, Andersen provided a hypothetical example on how police officers were trained by OPD to respond to certain high priority 911 calls that required response by two officers.

Several days after the meeting, reports of Andersen's statements were relayed to Warren. On December 20, 2004, Warren initiated an Internal Affairs (IA) investigation of Andersen in which he sought to determine exactly what Andersen said at the

---

[1] Neb. Rev. Stat. §§ 48-801 to 48-838 (Reissue 2004).

December 14 meeting and whether Andersen had advised officers to disregard departmental standard operating procedures.

In June 2005, IA determined that Andersen had not violated departmental procedures and had not acted unprofessionally. Warren adopted those findings and took no disciplinary action against Andersen.

### 2. HOUSH INVESTIGATION AND DISCIPLINE

In response to the events involving Andersen, OPD Sgt. Kevin Housh wrote an article in the February 2005 issue of the Union newspaper, "The Shield," which is distributed to members of the Union as well as to members of the community. Housh's article was generally critical of the standard operating procedures for two-officer 911 calls and the manner in which the city and OPD calculated response time. Housh characterized city officials as "[a] bunch of grown men and women, supposedly leaders, acting like petty criminals trying to conceal some kind of crime."[2] He also stated that "[t]hey refuse to do it, they know they've screwed up, and rather than admitting guilt, they (whoever they are) will make history and try to control what is said/revealed during union meetings regarding response time."[3]

On February 7, 2005, Warren initiated an IA investigation of Housh based on his article in The Shield. Describing the language from the article as derogatory and inflammatory, Warren alleged that Housh's conduct constituted gross disrespect and insubordination and was unbecoming an officer, in violation of OPD rules of conduct.

After conducting its investigation, IA determined that the unprofessional conduct allegation against Housh should be sustained. On February 24, 2005, Warren adopted that finding. However, contrary to other recommendations for discipline, Warren terminated Housh's employment. The Union subsequently appealed Housh's termination to the city personnel board. Thereafter, the city and the Union reached an agreement whereby Housh was reinstated to OPD but was required to,

---

[2] Kevin Housh, *This 'n That*, The Shield (Omaha Police Union Local 101, I.U.P.A., AFL-CIO), Feb. 2005, at 1.

[3] *Id.*

among other things, serve a 20-day suspension without pay and discontinue working on the emergency response unit.

### 3. MEETING WITH WARREN

On August 22, 2005, two Union representatives met privately with Warren in an attempt to discuss the appropriate methods of handling future Union speech issues as well as OPD's handling of Andersen's case. The Union claims that it sought assurances from Warren that he would not interfere with, investigate, or discipline off-duty officers for their conduct at Union meetings or in Union publications. Warren refused to discuss Andersen's case, as it was still an ongoing controversy. Warren also purportedly stated that he retained the right "to initiate an internal investigation on off duty union activities if he determines they involve either insubordination or gross disrespect of himself or his administration or false comments [or] slander." But, Warren also commented that he was not trying to censor anyone and that he would only initiate an IA investigation of an officer if he believed there was merit to such investigation.

### 4. CIR PROCEEDINGS

On September 2, 2005, the Union filed a petition with the CIR against the appellants. The Union claimed that the appellants' investigations of Andersen and Housh and termination of Housh's employment had "chilled" other Union members' expression of opinions at Union meetings and in the Union publication. As a result, the Union alleged that the appellants had engaged in prohibited labor practices under § 48-824(2)(a) by interfering with, restraining, and coercing Union members in their exercise of rights granted under § 48-837. The Union prayed that the appellants should be restrained from interfering with Union members' rights to express their opinions at Union meetings or in Union publications relating to terms and conditions of their employment, the city's administration, and OPD's management. The Union also sought attorney fees and any other appropriate remedy within the CIR's jurisdiction. The appellants answered by denying the specific allegations in the petition and by raising several affirmative defenses, including a lack of CIR jurisdiction.

After conducting a trial in which testimony was heard and evidence was received, the CIR issued a written order granting a portion of the relief sought by the Union. The CIR found that numerous employees had indicated that Warren's actions had limited their involvement with the Union, including decreased meeting attendance and fewer articles submitted for publication. However, the CIR concluded that the IA investigation of Andersen did not constitute an interference, restraint, or coercion in the exercise of the right to participate in Union activities.

As to Housh, the CIR reasoned that his article was a protected union activity if it was "concerted activity" falling under the protection of § 48-824(2)(a). Looking to federal labor cases for guidance, the CIR noted that employee speech was a protected concerted activity if it related to working conditions. It then determined that Housh's article pertained to officer safety, which was a working condition and a mandatory subject of bargaining. The CIR also found, based on federal labor case law, that an employee only loses protection for speech that is deliberately or recklessly untrue. The CIR concluded that "Housh's statements, while certainly constituting intemperate, abusive and insulting rhetorical hyperbole, fall short of deliberate or reckless untruth. The comments were made in a union publication in the context of a management/union disagreement, and they were therefore protected from interference, restraint or coercion by management."

As a remedy, the CIR ordered the appellants "not to interfere in any way" with statements made by employees in the Union publication which did not violate the standard of deliberate or reckless untruth. The appellants were also ordered to place a statement in the Union newsletter indicating that they would recognize the Union members' rights to protected activity. The appellants perfected this timely appeal, which we moved to our docket pursuant to our statutory authority to regulate the caseloads of the appellate courts of this state.[4]

---

[4] See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## II. ASSIGNMENTS OF ERROR

The appellants assign, restated, that the CIR erred in finding that (1) the calculation of response times was a mandatory bargaining issue and (2) all speech by employees in the Union newspaper is protected unless deliberately or recklessly untrue.

On cross-appeal, the Union assigns, restated, that the CIR erred in failing to (1) find the appellants' investigation of Andersen was a prohibited practice requiring the deletion of all investigation records, (2) make Housh whole for the losses he sustained from the appellants' prohibited practice, and (3) award the Union reasonable attorney fees.

## III. STANDARD OF REVIEW

■ Any order or decision of the CIR may be modified, reversed, or set aside by the appellate court on one or more of the following grounds and no other: (1) if the CIR acts without or in excess of its powers, (2) if the order was procured by fraud or is contrary to law, (3) if the facts found by the CIR do not support the order, and (4) if the order is not supported by a preponderance of the competent evidence on the record considered as a whole.[5]

■ In an appeal from a CIR order regarding prohibited practices stated in § 48-824, an appellate court will affirm a factual finding of the CIR, if, considering the whole record, a trier of fact could reasonably conclude that the finding is supported by a preponderance of the competent evidence.[6]

## IV. ANALYSIS

### 1. CITY'S APPEAL

(a) Mandatory Subject of Collective Bargaining

The CIR has jurisdiction over certain "industrial disputes involving governmental service."[7] As used in the Act, the term

---

[5] See *Hyannis Ed. Assn. v. Grant Cty. Sch. Dist. No. 38-0011*, 269 Neb. 956, 698 N.W.2d 45 (2005).

[6] *Crete Ed. Assn. v. Saline Cty. Sch. Dist. No. 76-0002*, 265 Neb. 8, 654 N.W.2d 166 (2002).

[7] § 48-810.

"industrial dispute" includes "any controversy concerning terms, tenure, or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, or refusal to discuss terms or conditions of employment."[8] Wages, hours, and other terms and conditions of employment or any question arising thereunder are considered to be mandatory subjects of bargaining under the Act.[9]

In their first assignment of error, the appellants assert that the CIR erred in finding that "[t]he calculation of response times is a working condition which affects safety and is a mandatory subject of bargaining." The appellants contend that the calculation of response time is not a working condition, but, rather, a mechanism for measuring departmental effectiveness. They argue that such calculation is merely a statistical tool that OPD management uses to evaluate OPD's ability to respond to 911 emergency calls. The appellants argue that changing the method of calculation would not affect OPD's service to the public or officer safety, but would impair the ability of OPD to compare future response times with past response times. The appellants thus contend that as an evaluative tool, the response time calculation is solely within management's prerogative.

The Union, on the other hand, argues that calculation of response time has broader implications which affect departmental staffing. The Union contends that if response time is calculated in the manner it claims is proper, the calculations would reveal longer 911 response times, which may indicate that OPD staffing is deficient. The Union contends that these staffing issues have an effect on officer safety, a condition of employment.

 A matter which is of fundamental, basic, or essential concern to an employee's financial and personal concern may be considered as involving working conditions and is mandatorily bargainable even though there may be some minor

---

[8] § 48-801(7).

[9] *Crete Ed. Assn. v. Saline Cty. Sch. Dist. No. 76-0002, supra* note 6. See § 48-816(1).

influence on management prerogative.[10] Company rules relating to employee safety and work practices involve conditions of employment.[11] Conversely, management prerogatives include the right to hire, to maintain order and efficiency, to schedule work, and to control transfers and assignments.[12] Based on our review of the record, we conclude that the CIR's finding that the calculation of response times implicates officer safety is supported by the evidence. On the surface, both parties are arguing in terms of the calculation of response times. But the essential nature of their arguments is whether an OPD response to a two-officer 911 call is completed when the first officer arrives at the call location or when the second officer arrives at the call location. Thus, the real issue can be understood to involve how officers should respond to two-officer 911 calls, not merely how OPD calculates their response time. Under this broader reading of the issue, which the CIR deemed appropriate, it can be fairly said that response time does relate to officer safety and, thus, the manner in which it is determined affects a condition of employment.

(b) Protected Union Speech

Section 48-824(2) of the Act states: "It is a prohibited practice for any employer or the employer's negotiator to: (a) Interfere with, restrain, or coerce employees in the exercise of rights granted by the Industrial Relations Act." Section 48-837 provides that "[p]ublic employees shall have the right to form, join, and participate in . . . any employee organization of their own choosing [and] shall have the right to be represented by employee organizations to negotiate collectively with their public employers in the determination of their terms and conditions

---

[10] See *Metro. Tech. Com. Col. Ed. Assn. v. Metro. Tech. Com. Col. Area*, 203 Neb. 832, 281 N.W.2d 201 (1979).

[11] See *Norfolk Educ. Assn. v. School Dist. of Norfolk*, 1 C.I.R. No. 40 (1971) (citing *N. L. R. B. v. Gulf Power Company*, 384 F.2d 822 (5th Cir. 1967)).

[12] See, *Lincoln Firefighters Assn. v. City of Lincoln*, 253 Neb. 837, 572 N.W.2d 369 (1998), *overruled on other grounds, Hyannis Ed. Assn. v. Grant Cty. Sch. Dist. No. 38-0011, supra* note 5; *School Dist. of Seward Education Assn. v. School Dist. of Seward*, 188 Neb. 772, 199 N.W.2d 752 (1972).

of employment . . . ." As framed by the parties, the prohibited practice issue before the CIR was whether the actions taken by Warren against Andersen and Housh and the comments made by Warren to Union leadership interfered with, restrained, or coerced employees from exercising their right to participate in the Union.

### (i) NLRA Speech Standard

The CIR determined that § 48-824(2)(a) is "almost identical" to § 8(a)(1) of the National Labor Relations Act (NLRA).[13] Recognizing that decisions under the NLRA can be helpful in interpreting the Act, but are not binding,[14] the CIR looked to decisions by the National Labor Relations Board for guidance.

Under the NLRA, employees have the right to engage in "concerted activities for the purpose of . . . mutual aid or protection."[15] The National Labor Relations Board construes this right to extend protection to employee speech which relates to working conditions.[16] While not condoned by the board, employees may use "'intemperate, abusive, or insulting language without fear of restraint or penalty if the speaker believes such rhetoric to be an effective means to make a point.'"[17] But protection of speech under the NLRA is not unrestricted; it is lost when work-related speech constitutes a "deliberate or reckless untruth."[18]

Importantly, the scope of NLRA coverage is limited. By its own terms, the NLRA does not apply to the federal government or any state or municipal governments in their capacities

---

[13] See 29 U.S.C. § 151 et seq. (2000).

[14] Crete Ed. Assn. v. Saline Cty. Sch. Dist. No. 76-0002, supra note 6.

[15] 29 U.S.C. § 157.

[16] See Eastex, Inc. v. NLRB, 437 U.S. 556, 98 S. Ct. 2505, 57 L. Ed. 2d 428 (1978).

[17] Phoenix Transit System, 337 N.L.R.B. 510, 514 (2002) (citing Letter Carriers v. Austin, 418 U.S. 264, 94 S. Ct. 2770, 41 L. Ed. 2d 745 (1974)).

[18] Id. (citing Linn v. Plant Guard Workers, 383 U.S. 53, 86 S. Ct. 657, 15 L. Ed. 2d 582 (1966)).

as employers.[19] Instead, it applies only to private sector employment.[20]

### (ii) Public Sector Employees

In this case, the CIR applied the NLRA "deliberate and reckless untruth" standard in determining whether Housh's speech exceeded the protections granted under the Act. But, public sector employees, like OPD police officers, are not guaranteed the rights and protections of the NLRA. Thus, we are presented with the legal question of whether the Act guarantees similar rights and protections to public sector employees in Nebraska. While the language of the Act is broad enough to encompass the rights granted under the NLRA, we are not persuaded that the "deliberate or reckless untruth" standard is the appropriate method to analyze the speech of public sector employees.

The Act has a somewhat different focus than the NLRA. Although couched in broad Commerce Clause language, the NLRA attempts to rectify the "inequality of bargaining power between employees . . . and employers" by providing certain rights to employees.[21] The Act, on the other hand, focuses almost exclusively on protecting the public.

> The continuous, uninterrupted and proper functioning and operation of the governmental service . . . to the people of Nebraska are hereby declared to be essential to their welfare, health and safety. It is contrary to the public policy of the state to permit any substantial impairment or suspension of the operation of governmental service . . . by reason of industrial disputes therein. It is the duty of the State of Nebraska to exercise all available means and every power at its command to prevent the same so as to protect

---

[19] See 29 U.S.C. § 152(2).

[20] See *NLRB v. Natural Gas Utility District*, 402 U.S. 600, 91 S. Ct. 1746, 29 L. Ed. 2d 206 (1971) (holding political subdivision exemption limited to entities either (1) created directly by state, so as to constitute departments or administrative arms of government, or (2) administered by individuals responsible to public officials or to general electorate).

[21] 29 U.S.C. § 151.

> its citizens from any dangers, perils, calamities, or catas-
> trophes which would result therefrom. It is therefor further
> declared that governmental service . . . are clothed with
> a vital public interest and to protect same it is necessary
> that the relations between the employers and employees in
> such industries be regulated by the State of Nebraska to the
> extent and in the manner hereinafter provided.[22]

While the Act does provide public employees some of the same rights granted under the NLRA, it also explicitly removes other rights utilized by private sector employees, most notably the right to strike.[23] Therefore, we view the Act not only as an attempt to level the employment playing field, but also as a mechanism designed to protect the citizens of Nebraska from the effects and consequences of labor strife in public sector employment. As a result, we believe the NLRA's "deliberate and reckless untruth" standard is inappropriate in the context of public sector employment.

We are also cognizant of the fact that the labor conflict in this case involves parties serving a special purpose to the public. As a police department, OPD operates as a paramilitary organization charged with maintaining public safety and order.[24] Federal courts have recognized this special purpose, finding that these employers should be given "more latitude in their decisions regarding discipline and personnel regulations than an ordinary government employer."[25]

For instance, in *Tindle v. Caudell*,[26] a police officer was disciplined for wearing an offensive costume to an off-duty, union-sponsored Halloween party. In upholding the officer's discipline, the court recognized that members of police departments "may be subject to stringent rules and regulations that could not apply

---

[22] § 48-802(1).

[23] See § 48-802(2) and (3).

[24] See *Tindle v. Caudell*, 56 F.3d 966 (8th Cir. 1995).

[25] *Id.* at 971. Accord *Crain v. Board of Police Com'rs*, 920 F.2d 1402 (8th Cir. 1990). See *Hughes v. Whitmer*, 714 F.2d 1407 (8th Cir. 1983).

[26] *Tindle v. Caudell, supra* note 24.

to other government agencies."[27] Likewise, in *Crain v. Board of Police Com'rs*,[28] a police officer was discharged for violating the police department's sick leave regulations. In analyzing the regulations, the court noted that "[r]egulations limiting even those rights guaranteed by the explicit language of the Bill of Rights are reviewed more deferentially when applied to certain public employees than when applied to ordinary citizens."[29] Moreover, in *Hughes v. Whitmer*,[30] a state trooper was transferred in order to resolve a debilitating morale problem created in part by the trooper's accusations involving superior officers. Acknowledging the state patrol's paramilitary status, the court found that "[m]ore so than the typical government employer, the Patrol has a significant government interest in regulating the speech activities of its officers in order 'to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution.' "[31] We agree with the reasoning of the federal courts and conclude that the NLRA's "deliberate or reckless untruth" standard is inappropriate for determining whether the Housh article constituted protected speech under the Act. Its utilization by the CIR was therefore contrary to law.

### (iii) Appellants' Proposed Speech Standard

■ In their second assignment of error, the appellants argue that this is actually a First Amendment free speech case and that the proper standard is the balancing test espoused by the U.S. Supreme Court in *Pickering v. Board of Education*.[32] As the basis for this argument, the appellants contend that both the U.S. Constitution and the Nebraska Constitution already provide protection to public employees for engaging in work-related

---

[27] *Id.* at 973.

[28] *Crain v. Board of Police Com'rs, supra* note 25.

[29] *Id.* at 1408.

[30] *Hughes v. Whitmer, supra* note 25.

[31] *Id.* at 1419 (quoting *Gasparinetti v. Kerr*, 568 F.2d 311 (3d Cir. 1977)).

[32] *Pickering v. Board of Education*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968).

speech. Under the appellants' theory, the Union members would be required to assert their First Amendment rights by means of claims against the appellants pursuant to 42 U.S.C. § 1983 (2000). But, the CIR has no authority to vindicate constitutional rights.[33] Therefore, the CIR would have no jurisdiction to hear a case of this nature.

■ While we agree with the appellants that public employees do have First Amendment speech rights, we are not persuaded that the *Pickering* balancing test is the appropriate method to determine whether union speech is protected under the Act. The CIR is not a court and is in fact an administrative body performing a legislative function.[34] It has only those powers delineated by statute, and should exercise that jurisdiction in as narrow a manner as may be necessary.[35] Allowing the CIR to decide cases based on constitutional jurisprudence would blur the jurisdictional boundaries between that administrative body and the courts of law. Therefore, we reject the appellants' overture to apply the *Pickering* balancing test to prohibited practice cases under the Act.

### (iv) Federal Employee Speech Standard

Although by its terms, the NLRA does not apply to public sector employment,[36] federal employees are afforded labor protections under the Federal Service Labor-Management Relations Act.[37] In 5 U.S.C. § 7116(a) of those statutes, it provides that "it shall be an unfair labor practice for an agency . . . (1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right" under these statutes. Likewise, 5 U.S.C. § 7102 states:

> Each employee shall have the right to form, join, or assist any labor organization . . . freely and without fear of penalty or reprisal, and each employee shall be protected

---

[33] *Nebraska Pub. Emp. v. Otoe Cty.*, 257 Neb. 50, 595 N.W.2d 237 (1999).

[34] *Calabro v. City of Omaha*, 247 Neb. 955, 531 N.W.2d 541 (1995).

[35] *Crete Ed. Assn. v. Saline Cty. Sch. Dist. No. 76-0002, supra* note 6.

[36] See 29 U.S.C. § 152(2).

[37] 5 U.S.C. § 7101 et seq. (2000 & Supp. IV 2004).

in the exercise of such right. Except as otherwise provided under this chapter, such right includes the right—

(1) to act for a labor organization in the capacity of a representative and the right, in that capacity, to present the views of the labor organization to heads of agencies and other officials of the executive branch of the Government, the Congress, or other appropriate authorities, and

(2) to engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter.

While these statutes are not identical to the comparable provisions of the Act in Nebraska, the language is substantively similar. Because of this similarity to the federal act, we find it helpful to consider Federal Labor Relations Authority (FLRA) cases interpreting § 7102.

In *U.S. Dept. of Veterans Affairs Med. Ctr. Jamaica Plain, Mass.,*[38] a police officer was suspended for insubordination for making threatening remarks in a letter to the chief of police. The FLRA noted that under § 7102, employees had the right to present labor organization views to management. It further recognized that "employee action to publicize labor disputes or issues that have a direct bearing on conditions of employment is protected activity" and that such protection "extends to the publicizing of such disputes or issues through the media."[39] However, it acknowledged that "an agency has the right to discipline an employee who is engaged in otherwise protected activities for actions that 'exceed the boundaries of protected activity such as flagrant misconduct.'"[40] Such flagrant misconduct includes remarks or actions that are of an "'outrageous and insubordinate nature'" and which "compromise an agency's ability to accomplish its mission, disrupt discipline or are disloyal."[41]

---

[38] *U.S. Dept. of Veterans Affairs Med. Ctr. Jamaica Plain, Mass.,* 50 F.L.R.A. 583 (1995).

[39] *Id.* at 586.

[40] *Id.*

[41] *Id.*

In *Department of the Air Force Grissom Air Force Base, Ind.*,[42] an employee, who was also a union representative, was suspended for directing offensive language at the employer's representative during collective bargaining negotiations. The FLRA recognized that employee conduct may " " "exceed the boundaries of protected activity such as flagrant misconduct." ' "[43] In determining whether an employee has engaged in flagrant misconduct, the FLRA

> balances the employee's right to engage in protected activity, which "permits leeway for impulsive behavior, . . . against the employer's right to maintain order and respect for its supervisory staff on the jobsite." . . . Relevant factors in striking this balance include: (1) the place and subject matter of the discussion; (2) whether the employee's outburst was impulsive or designed; (3) whether the outburst was in any way provoked by the employer's conduct; and (4) the nature of the intemperate language and conduct.[44]

In *Department of the Navy Naval Facilities Eng. Command W. Div. San Bruno, Cal.*,[45] an employee, also a union steward, was reprimanded for using derogatory and insulting language about other personnel in a letter sent to other union employees. The FLRA found many of the employee's remarks to be offensive and did not condone them. However, it recognized that the employee's comments in the letter were protected unless they constituted " 'flagrant misconduct.' "[46]

In *American Fed. of Govt. Employees Nat. Border Patrol Council*,[47] a border patrol agent, also a union representative, was suspended for disrespectful conduct toward his supervisor. The

---

[42] *Department of the Air Force Grissom Air Force Base, Ind.*, 51 F.L.R.A. 7 (1995).

[43] *Id.* at 11.

[44] *Id.* at 11-12.

[45] *Department of the Navy Naval Facilities Eng. Command W. Div. San Bruno, Cal.*, 45 F.L.R.A. 138 (1992).

[46] *Id.* at 156.

[47] *American Fed. of Govt. Employees Nat. Border Patrol Council*, 44 F.L.R.A. 1395 (1992).

FLRA found that at the time of the comments, the agent was functioning as a representative of the union. Thus, his comments were protected activity under § 7102 unless they constituted "flagrant misconduct."

 We conclude that a similar legal standard should apply to the determination of whether speech is protected under the Act. Under this new standard, public employees belonging to a labor organization have the protected right to engage in conduct and make remarks, including publishing statements through the media, concerning wages, hours, or terms and conditions of employment. However, employees lose the statutory protection of the Act if the conduct or speech constitutes "flagrant misconduct." Flagrant misconduct includes, but is not limited to, statements or actions that (1) are of an outrageous and insubordinate nature, (2) compromise the public employer's ability to accomplish its mission, or (3) disrupt discipline. It would also include conduct that is clearly outside the bounds of any protection, including, for example, assault and battery[48] or racial discrimination.[49] Importantly, the CIR must balance the employee's right to engage in protected activity, which permits some leeway for impulsive behavior, against the employer's right to maintain order and respect for its supervisory staff. Factors that the CIR may consider, but would not necessarily be determinative, include: (1) the place and subject matter of the conduct or speech, (2) whether the employee's conduct or speech was impulsive or designed, (3) whether the conduct or speech was provoked by the employer's conduct, and (4) the nature of the intemperate language or conduct.

### (v) Conclusion

Because we have prescribed a new standard for determining when union speech is protected under the Act, we deem it appropriate that the CIR should apply the standard in the first instance to the facts pertaining to the Housh article. Accordingly,

---

[48] See *Department of the Air Force v. F.L.R.A.*, 294 F.3d 192 (D.C. Cir. 2002).

[49] See *Veterans Admin., Washington D.C.*, 26 F.L.R.A. 114 (1987).

we reverse, and remand to the CIR with directions to make that determination.

## 2. Union's Cross-Appeal

### (a) Andersen's Prohibited Practice Claim

The Union argues that the CIR erred in finding that the IA investigation of Andersen did not constitute a prohibited labor practice. In its order, the CIR found that the evidence did not show that the IA investigation of Andersen was "improperly conceived" or "improperly performed" or that the procedure of conducting IA investigations instead of some lesser means of investigation had been overused or otherwise used abusively. The CIR concluded that "[a] pattern or practice of using an internal affairs investigation based upon 'anonymous' phone calls could well establish interference, restraint or corrosion in the exercise of the right to participate in union activities, but the evidence here does not establish such a pattern or practice."

In an appeal from a CIR order regarding prohibited practices under § 48-824, the Nebraska Supreme Court will affirm a factual finding of the CIR if, considering the whole record, a trier of fact could reasonably conclude that the finding is supported by a preponderance of the competent evidence.[50] Based on our reading of the record, we conclude that the CIR's finding is supported by a preponderance of the evidence. Thus, the Union's argument has no merit.

### (b) Housh's Remedy

Next, the Union argues that the CIR erred in failing to provide a remedy to Housh after finding the appellants had engaged in a prohibited labor practice. Because we have reversed the CIR's finding that a prohibited practice occurred with respect to Housh, we need not reach this issue. However, an appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings.[51] Expressing no

---

[50] See *Crete Ed. Assn. v. Saline Cty. Sch. Dist. No. 76-0002, supra* note 6.

[51] *Perry Lumber Co. v. Durable Servs.*, 271 Neb. 303, 710 N.W.2d 854 (2006); *In re Estate of Rosso*, 270 Neb. 323, 701 N.W.2d 355 (2005).

opinion as to whether the CIR will determine on remand that a prohibited practice occurred, we briefly address the question of Housh's remedy.

When the CIR finds that a party has violated the Act, §§ 48-819.01 and 48-825(2) grant the CIR authority to issue such orders as it may find necessary to provide adequate remedies to the parties to effectuate the public policy enunciated in § 48-802.[52] The record fully supports the finding by the CIR that Housh is not a party to this action and has entered into a separate settlement agreement regarding his personal claims against the appellants. We conclude that the CIR did not err in determining that Housh was not entitled to personal relief in this proceeding based upon any prohibited practice claim asserted by the Union.

### (c) Attorney Fees

Finally, the Union argues that the CIR erred in not awarding reasonable attorney fees. Although unnecessary to our disposition of this appeal, we exercise our discretion to reach this issue because of the possibility that it will recur on remand.[53]

Rules of the Nebraska Commission of Industrial Relations 42 (rev. 2005) states: "Attorney's fees may be awarded as an appropriate remedy when the Commission finds a pattern of repetitive, egregious, or willful prohibited conduct by the opposing party." In this case, the CIR found that "the evidence does not establish a willful pattern or practice of violation of the [Union's] freedom in conducting union activities, and it does not establish that the investigations were undertaken in bad faith. Therefore, payment of attorney fees will not be ordered."

Applying the aforementioned standard of review to the whole record,[54] we conclude that the CIR's finding is supported by a preponderance of the competent evidence. Therefore, this argument has no merit.

---

[52] *Operating Engrs. Local 571 v. City of Plattsmouth,* 265 Neb. 817, 660 N.W.2d 480 (2003).

[53] See, *Perry Lumber Co. v. Durable Servs., supra* note 51; *In re Estate of Rosso, supra* note 51.

[54] See *Crete Ed. Assn. v. Saline Cty. Sch. Dist. No. 76-0002, supra* note 6.

## V. CONCLUSION

For the reasons discussed, we affirm the order of the CIR on all issues presented in this appeal, except its determination that the appellants committed a prohibited practice with respect to Housh. We reverse and vacate that determination because it was based on an incorrect legal standard and therefore contrary to law. We remand the cause to the CIR with directions to apply the legal standard set forth in this opinion to that claim on the existing record.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

HEAVICAN, C.J., not participating.